TYCO LABORATORIES, INC. and
AMBG Corporation, Plaintiffs,

v.

CUTLER–HAMMER, INC., Defendant.

No. 78 Civ. 3283.

United States District Court,
S. D. New York.

April 29, 1980.

**2**

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiffs; Robert S. Smith, New York City, of counsel.

Esanu, Katsky & Korins, New York City, for defendant; David L. Katsky, New York City, of counsel.

OPINION

ROBERT J. WARD, District Judge.

This is an action for a declaratory judgment pursuant to 28 U.S.C. § 2201. Plaintiffs, Tyco Laboratories, Inc. and its wholly-owned subsidiary, AMBG Corp., (collectively "Tyco") seek a declaration that they are not liable under section 16(b) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78p(b), for "short swing" profits realized on a sale of defendant Cutler-Hammer, Inc's ("C–H") common stock. Defendant moves pursuant to Rule 12(c), Fed.R. Civ.P., for judgment on the pleadings dismissing Tyco's complaint and entering judgment on its section 16(b) counterclaim. Plaintiffs have cross-moved pursuant to Rules 15(a) and 15(d), Fed.R.Civ.P., to amend and supplement their complaint. For the reasons hereinafter stated, defendant's motion is granted and plaintiffs' cross-motion is denied.

There is no dispute as to the essential facts. Prior to April 7, 1978, the common stock of C–H was registered pursuant to section 12 of the Act and publicly traded on both the New York and Boston Stock Exchanges. During a four-month period beginning in late November 1977 and continuing through March 8, 1978, Tyco purchased 506,400 shares of C–H common stock, representing approximately 8½% of the total number of C–H shares outstanding for cash in the aggregate amount of $17,302,490. On April 7, 1978, Tyco purchased an additional 225,400 shares of C–H common stock in open market brokerage transactions for cash in the amount of $8,720,827.50. The shares purchased on April 7, 1978 together with the shares previously purchased, brought Tyco's holdings to 731,800 shares, or approximately 12% of the total number of outstanding C–H shares.

During the four-day period April 10 through April 13, 1978, Koppers Company, Inc. ("Koppers") acquired approximately 21% of the voting stock of C–H. Koppers, a Delaware corporation, is a manufacturing, engineering and construction company many times larger and with substantially greater financial resources than plaintiffs.

E. B. Fitzgerald, Chairman of the Board and chief executive officer of C–H, was a director of Koppers.

On April 10, 1978 C–H instituted suit against Tyco in federal court in Wisconsin alleging numerous violations of federal and state law in connection with Tyco's purchases of C–H stock. C–H requested: (1) that the court enjoin Tyco from purchasing any additional C–H shares and from voting or otherwise exercising rights of ownership in the C–H stock previously purchased, and (2) that the court order Tyco to dispose of its C–H shares. C–H obtained a temporary restraining order on April 12, 1978 barring Tyco from acquiring any additional C–H shares. On April 28, 1978 C–H's motion for a preliminary injunction was denied; on the next day, the temporary restraining order C–H had obtained expired.

Between April 10, 1978 and June 9, 1978, Tyco purchased an additional 1,374,100 shares of C–H common stock at a cost of $67,537,680. Tyco's purchases through June 9, 1978 aggregated 2,105,900 shares at a total cost of $92,560,997.50, inclusive of brokerage commissions. On June 12, 1978, Tyco sold its entire holdings of C–H common stock to Eaton Corporation for cash in the amount of $55.00 per share, less a brokerage commission of $.10 per share, for a total of $115,613,910. In connection with this transaction, Eaton agreed that, if it acquired a majority of the outstanding common stock of C–H, it would, so far as possible, cause C–H to sell plaintiffs all of C–H's holdings of Leeds & Northrup Company. This portion of the agreement was never carried out, however, because C–H sold all its holdings of common stock of Leeds & Northrup Company before Eaton acquired a majority of the outstanding common stock of C–H.

On July 6, 1978 C–H's counsel asserted in a letter to plaintiffs that they had violated section 16(b) through their purchase and sale of C–H stock and demanded that they account for their profits in C–H stock during the six-month period from December 12, 1977 through June 12, 1978. Two weeks later, on July 20, 1978, plaintiffs filed the instant action requesting the Court to declare: (1) that they are not liable to C–H for profits realized on the purchase and sale of C–H stock during the six-month period ended June 12, 1978, and (2) that C–H is estopped, because of its prior acts and conduct, from recovering any such profits. Alternatively, Tyco requests the Court to declare: (1) that it is liable to C–H under section 16(b) only for profits realized on the sale of the 1,374,100 shares of C–H stock purchased after April 7, 1978 and (2) that this profit be determined as the excess of $75,438,090, the amount realized on the sale of such shares, over $67,537,680, the cost of such shares, after deducting all plaintiffs' expenses in purchasing and selling these shares. C–H has counterclaimed requesting that the court dismiss the complaint on the merits and award it the value of plaintiffs' alleged section 16(b) short swing profits and of the agreement with respect to the Leeds & Northrup stock, in an amount to be determined at trial.

The Court will first address plaintiffs' cross-motion to amend and supplement their complaint. Plaintiffs' proposed amended complaint is claimed to allege facts that occurred or were discovered after the original complaint was filed and "some amplification of evidentiary detail" based upon facts purportedly uncovered during discovery.

Although under the terms of Rule 15(a), Fed.R.Civ.P., leave to amend "shall be freely given when justice so requires", *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962), this does not mean that such amendment should be granted under all circumstances. Where there has been "undue delay, bad faith, or dilatory motive," *Foman v. Davis, supra*, amendment should be denied. The Court has determined after comparing the proposed amended complaint with the original complaint that plaintiffs could have moved to amend and supplement their complaint in the manner proposed long before now and that granting plaintiffs' motion at this time would not serve the interests of justice. In any event, inasmuch as the new matter in

the proposed amended and supplemented complaint relates principally to the issue of estoppel, which will be discussed below, the Court is of the view that plaintiffs will suffer no prejudice through denial of their motion.

In evaluating defendant's Rule 12(c) motion this Court must take as admitted the "well-pleaded material facts alleged in the complaint," *Gumer v. Shearson, Hammill & Co., Inc.*, 516 F.2d 283, 286 (2d Cir. 1974), and draw "all reasonable inferences and intendments from these facts" in favor of the plaintiff. *Quality Mercury, Inc. v. Ford Motor Co.*, 542 F.2d 466, 468 (8th Cir. 1976), *cert. denied*, 433 U.S. 914, 97 S.Ct. 2986, 53 L.Ed.2d 1100 (1977), *citing National Metropolitan Bank v. United States*, 323 U.S. 454, 457, 65 S.Ct. 354, 356, 89 L.Ed. 383 (1945). Moreover, although contested issues of fact should not be resolved upon a Rule 12(c) motion, *George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 553–54 (2d Cir. 1977), a court need not accept as admitted mere legal conclusions or characterizations contained in the non-movant's pleadings. *Diaz v. Ward*, 437 F.Supp. 678, 681 (S.D.N.Y. 1977); *Shade v. Commonwealth of Pa., Dep't. of Transportation*, 394 F.Supp. 1237, 1243 (M.D.Pa.1975); 5 C. Wright & A. Miller *Federal Practice and Procedure* § 1368, pp. 692–93; 2A J. Moore, *Federal Practice* ¶ 12.15, at 2343; *see also S & S Realty Corp. v. Kleer-Vu Industries, Inc.*, 575 F.2d 1040, 1044 (2d Cir. 1978). Applying these principles to the instant case the Court concludes that judgment on the pleadings in favor of

defendant on the issue of liability contained in its counterclaim is warranted.

Section 16(b) of the Act[1] was originally intended to apply to insider trading within the statutory six-month period in an automatic, almost mechanistic fashion, which came to be known as the "objective approach." As the Supreme Court stated:

"In order to achieve its goals, Congress chose a relatively arbitrary rule capable of easy administration. The objective standard of Section 16(b) imposes strict liability upon substantially all transactions occurring within the statutory time period, regardless of the intent of the insider or the existence of actual speculation. This approach maximized the ability of the rule to eradicate speculative abuses by reducing difficulties in proof. Such arbitrary and sweeping coverage was deemed necessary to insure the optimum prophylactic effect."

*Reliance Electric Co. v. Emerson Electric Co.*, 404 U.S. 418, 422, 92 S.Ct. 596, 599, 30 L.Ed.2d 575 (1972), *quoting Bershad v. McDonough*, 428 F.2d 693, 696 (7th Cir. 1970).

However, in response to a series of cases requiring the application of the statute to transactions which were not classic purchases and sales for cash, such as stock conversions, mergers, and stock options, the Supreme Court approved a narrow exception to the generally broad and arbitrary reach of section 16(b). The court held that when a transaction is "unorthodox" and not clearly within the reach of the statute, the opportunity for speculative abuse should be

1. Section 16(b) provides in pertinent part:

For the purpose of preventing the unfair use of information which may have been obtained by [a] beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security pur-

chased or of not repurchasing the security sold for a period exceeding six months.

Under section 16(a) of the Act, 15 U.S.C. § 78p(a), the beneficial owner whose trading is regulated by section 16(b) is defined as anyone who owns directly or indirectly more than ten percent of any class of registered equity security. *Foremost-McKesson v. Provident Securities*, 423 U.S. 232, 234 n. 1, 96 S.Ct. 508, 511 n. 1, 46 L.Ed.2d 464 (1976). Thus, for the purposes of this action, Tyco became a beneficial owner of C–H stock on April 7, 1978. Determination of the precise purchase by which plaintiffs became a beneficial owner must await further proceedings.

assessed before section 16(b) liability is imposed:

> In deciding whether borderline transactions are within the reach of the statute, the courts have come to inquire whether the transaction may serve as a vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information—thereby endeavoring to implement congressional objectives without extending the reach of the statute beyond its intended limits.

*Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 594–95, 93 S.Ct. 1736, 1744–1745, 36 L.Ed.2d 503 (1973) (footnote omitted). This "subjective" or "pragmatic approach" was designed to mitigate the harshness of the application of section 16(b)'s strict liability standard to situations which, though arguably involving some equivalent of a section 16(b) purchase and sale, could not possibly allow for insider speculation and profiteering on non-public information.

Plaintiffs contend that inasmuch as their purchases of C–H stock and the sale of that stock to Eaton on June 12, 1978 occurred in the context of "a control contest type of situation", the sale was an "unorthodox" transaction within the *Kern County* exception to section 16(b) liability. They premise their contention that the sale was unorthodox upon the following assertions: (1) C–H was actively opposed to plaintiffs' retention of C–H stock; (2) plaintiffs were afraid that C–H would take some action to lock plaintiffs into an unmarketable minority position in C–H or to force plaintiffs to convert their C–H shares into securities of some other company in a merger or other business combination between C–H and some other company; and (3) C–H sought to force plaintiffs to divest their C–H stock at the earliest possible time, without regard to whether such divestiture might occur within six months of plaintiffs' purchase of the stock. Plaintiffs assert that insofar as the sale transaction of C–H was unorthodox and there was no possibility of speculative abuse there can be no liability under section 16(b).

The Court finds plaintiffs' arguments without merit. Their assertion that section 16(b) when read in light of its legislative purpose and economic reality, establishes that Congress did not intend to impose automatic liability upon ten percent shareholders who make short-swing cash-for-stock trades and profits unless they had "access to inside information" is supported by neither the legislative history of section 16(b) nor the case law applying it.

A review of the legislative history indicates, as defendant argues, that Congress specifically envisioned a statutory scheme which imposes automatic liability on any and all ten percent shareholders who buy and sell an issuer's securities within a six-month period, irrespective of whether they had access to or misused inside information. Thomas Corcoran, chief spokesman for the draftsmen and proponents of the Act stated this purpose graphically in testimony before the Senate Committee on Banking and Currency:

> You hold the director, irrespective of any intention or expectation to sell the security within six months after, because it will be absolutely impossible to prove the existence of such intention or expectation, and you have to have this crude rule of thumb. . . .

Hearings before the Committee on Banking and Currency on S. 84, 72d Cong., 2d Sess. and S. 56 and S. 97, 73d Cong., 1st and 2d Sess., 1934, 6557, *quoted in Smolowe v. Delendo Corp.*, 136 F.2d 231, 235 (2d Cir.), *cert. denied*, 320 U.S. 751, 64 S.Ct. 46, 88 L.Ed. 446 (1943). Moreover, the argument that the preamble to section 16(b), which states that the statute was enacted "[f]or the purpose of preventing the unfair use of information which may have been obtained by [a] beneficial owner, director, or officer by reason of his relationship to the issuer", indicates that Congress did not intend section 16(b) to apply in absolute fashion to transactions where there was no access to inside information, has long been rejected by courts called upon to interpret the Act. As the Second Circuit stated in *Smolowe*:

Had Congress intended that only profits from an actual misuse of inside information should be recoverable, it would have been simple enough to say so. Significantly, however, it makes recoverable the profit from any purchase and sale, or sale and purchase, within the period. The failure to limit the recovery to profits gained from misuse of information justifies the conclusion that the preamble was inserted for other purposes than as a restriction on the scope of the Act.

*Smolowe v. Delendo Corp., supra,* 136 F.2d at 236 (footnote omitted). Similarly, if Congress intended that only profits derived by those who had access to inside information were to be recoverable under the Act, it would have been simple enough to say so. It is apparent that Congress selected such a broad, harsh mechanism because it recognized that in no other way could the purpose of the statute be fully implemented and the potential abuses of insider trading effectively controlled.[2]

■ Plaintiffs' claim that the existence of a "control contest type of situation" renders the transaction at issue here "unorthodox" within the meaning of *Kern County* and warrants an inquiry into whether plaintiffs had access to inside information when they traded in C–H stock is without merit. The issue presented in *Kern County* was whether a section 16(b) "sale" occurs "when the target of the tender offer defends itself by merging into a third company and the tender offeror then exchanges his stock for the stock of the surviving company and also grants an option to purchase the latter stock that is not exercisable within the statutory six-month period." *Kern County Land Co. v. Occidental Petroleum Corp.,*

*supra,* 411 U.S. at 584, 93 S.Ct. at 1739. After considering the purpose of section 16(b) the Supreme Court stated:

> Although traditional cash-for-stock transactions that result in a purchase and sale or a sale and purchase within the six-month, statutory period are clearly within the purview of § 16(b), the courts have wrestled with the question of inclusion or exclusion of certain "unorthodox" transactions.

*Id.* at 593, 93 S.Ct. at 1744 (footnote omitted). The Supreme Court went on to hold that in interpreting the terms "purchase" or "sale" in "unorthodox" or "borderline" transactions, a "pragmatic approach" to section 16(b) was appropriate. *Id.* at 594, n. 26, 93 S.Ct. at 1744, n. 26. The Court defined "unorthodox" as including those "transactions not ordinarily deemed a sale or purchase", *id.* at 593–94, 93 S.Ct. at 1744, and listed the categories of transactions to which the term had been applied:

> stock conversions, exchanges pursuant to mergers and other corporate reorganizations, stock reclassifications, and dealings in options, rights, and warrants.

*Id.* at 593, n. 24, 93 S.Ct. at 1744, n. 24. Nowhere in *Kern County,* however, did the Supreme Court state or suggest that a "control contest type of situation" makes a securities transaction "unorthodox." On the contrary, what the Supreme Court actually stated is that a "cash-for-stock" transaction is orthodox and results in automatic section 16(b) liability.

Moreover, as defendant points out, no case either before or after *Kern County* has exempted cash-for-stock transactions from

---

**2.** Almost all courts, following *Smolowe* have recognized and applied the harsh express statutory scheme of section 16(b) to transactions which cannot be regarded as unorthodox. *See e. g., Kern County Land Co. v. Occidental Petroleum Corp., supra,* 411 U.S. at 592, 93 S.Ct. at 1744 ("the only method Congress deemed effective to curb the evils of insider trading was [the] flat rule [of section 16(b)]"); *Bershad v. McDonough, supra* ("[section 16(b)'s] arbitrary and sweeping coverage was deemed necessary to insure the optimum prophylactic effect"); *Blau v. Lamb,* 363 F.2d 507, 515 (2d Cir. 1966)

("[s]ection 16(b), it should be emphasized, embodies a rather uncommon regulatory mechanism. . . . [t]he arbitrary, some might say Draconian, nature of this statute reflects the view . . . that the unfair use of information by corporate insiders could only be effectively curbed by a law that made it unprofitable for insiders to engage in any short-term trading, whether fair or unfair"); *Lewis v. Arcara,* 401 F.Supp. 449, 452 (S.D.N.Y.1975) ("[t]he history of section 16(b) shows that Congress intended Draconian enforcement to avoid any loopholes").

the automatic application of section 16(b) [3] and, with a single exception, every case holding a transaction to be "unorthodox", and thus exempt from the "automatic" application of section 16(b), has involved a "conversion". [4] In short, plaintiffs have utterly failed to convince this Court that deviation from the express terms of the statute or the case law interpreting it, is justified here. Accordingly, the Court concludes that plaintiffs' cash-for-stock sale of its holdings of C–H stock to Eaton within six months of becoming a ten percent shareholder was an orthodox transaction subjecting plaintiffs to automatic section 16(b) liability. [5]

■ In any event, even if plaintiffs' complaint did allege transactions which could be viewed as "unorthodox", and the application of a "pragmatic" approach was warranted, plaintiffs could not escape the imposition of section 16(b) liability. As defendant notes, two factors must exist in order to remove even an "unorthodox" transaction from the ambit of section 16(b) liability: (1) the transaction must be involuntary, and (2) the transaction must present no possibility of speculative abuse. *Kern County Land Co. v. Occidental Petroleum Corp., supra,* 411 U.S. at 600, 93 S.Ct. at 1747. As the Second Circuit stated:

> The emphasis in Mr. Justice White's opinion was on two factors: (1) The unlikelihood of actual access to inside information in an atmosphere of hostility by a party adverse in interest; and (2) the

**3.** *See e. g., Provident Securities Co. v. Foremost-McKesson, Inc.,* 506 F.2d 601, 604 (9th Cir. 1974), *aff'd,* 423 U.S. 232, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976) ("cash-for-stock or essentially cash-for-stock [transactions] . . . must be tested against the literal terms" of section 16(b)); *American Standard, Inc. v. Crane Co.,* 510 F.2d 1043, 1060 (2d Cir. 1974), *cert. denied,* 421 U.S. 1000, 95 S.Ct. 2397, 44 L.Ed.2d 667 (1975) (escape from the "automatic ban" of section 16(b) has "thus far been limited to situations where there has been a 'conversion' of securities rather than a purchase or sale for cash"); *Anderson v. C. I. R.,* 480 F.2d 1304, 1308 (7th Cir. 1973) (cash-for-stock transactions held " 'clearly encompassed within the purview of § 16(b)' . . . In such cases the liability is, as a practical matter, inexorable"); *Cutler-Hammer, Inc. v. Leeds & Northrup Company, Inc.,* 469 F.Supp. 1021, 1023 (E.D.Wisc.1979) ("the transactions at bar may be fairly characterized as voluntary purchases and sales of securities for cash. As such, it is clear that they are not among those" exempt from section 16(b)'s automatic application); *Matas v. Siess,* 467 F.Supp. 217, 220 (S.D.N.Y.1979) (liability under section 16(b) is automatic except in those "transactions which [are] not classic purchases and sales for cash, such as stock conversions, mergers, and stock options"); *Schur v. Salzman,* 365 F.Supp. 725, 729 n. 10 (S.D.N.Y.1973) (the limited exception to automatic section 16(b) liability "has never been used in cases of 'garden variety' cash for stock transactions where a purchase and sale had clearly occurred, as it has never been doubted that section 16(b) was intended to reach such dealings"). *See also Allis-Chalmers Mfg. Co. v. Gulf & Western Indus., Inc.,* 527 F.2d 335, 351 (7th Cir. 1975), *cert. denied,* 423 U.S. 1078, 96 S.Ct. 865, 47 L.Ed.2d 89 (1976) (*Kern County* does "not suggest that ordinary, voluntary transactions commonly recognized

as purchases and sales would not automatically trigger the application of section 16(b) in future cases as they uniformly have in the past"); *Morales v. Arlen Realty & Development Corp.,* 352 F.Supp. 941, 944 (S.D.N.Y.1973).

**4.** *See e. g., American Standard Inc. v. Crane Co., supra* (merger); *Allis-Chalmers Mfg. Co. v. Gulf & Western Indus., Inc., supra* (merger); *Gold v. Sloan,* 486 F.2d 340 (4th Cir. 1974) (merger); *Matas v. Siess, supra* (exercise of stock appreciation rights); *Heit v. Katz,* [1978 Transfer Binder] CCH Fed.Sec.L.Rep., ¶ 96,405, p. 93,444 (S.D.N.Y.1978) (equivalent of call option); *Rothenberg v. United Brands Co.,* [1977–78 Transfer Binder] CCH Fed.Sec.L.Rep., ¶ 96,-045, p. 91,690 (S.D.N.Y.1977), *aff'd without opinion,* 573 F.2d 1295 (2d Cir. 1977) (conversion of shares pursuant to issuer's plan of recapitalization); *Freedman v. Barrow,* 427 F.Supp. 1129 (S.D.N.Y.1976) (exercise of stock appreciation rights); *Rosen v. Drisler,* 421 F.Supp. 1282 (S.D.N.Y.1976) (cancellation by issuer of stock option rights); *Kramer v. Ayer,* [1975–76 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 95,483, p. 99,435 (S.D.N.Y.1976) (merger); *Makofsky v. Ultra Dynamics Corp.,* 383 F.Supp. 631 (S.D.N.Y.1974) (exercise of option to purchase shares); *cf. Morales v. Gould Investors Trust,* 445 F.Supp. 1144 (S.D.N.Y.1977), *aff'd without opinion,* 578 F.2d 1369 (2d Cir. 1978) (court held that transaction was so "unique" that it was unorthodox yet nevertheless also held that the insider was liable under section 16(b)).

**5.** The fact that plaintiffs received consideration in addition to cash, *i. e.,* Eaton's agreement with respect to the Leeds & Northrup stock, does not in this Court's view render the sale "unorthodox." *Allis-Chalmers Mfg. Co. v. Gulf & Western Indus., Inc., supra,* 527 F.2d at 351.

utter inability of the unsuccessful party to control the course of events.

*American Standard, Inc. v. Crane Co.*, 510 F.2d 1043, 1054 (2d Cir. 1974), *cert. denied*, 421 U.S. 1000, 95 S.Ct. 2397, 44 L.Ed.2d 667 (1975).

■ Plaintiffs' complaint assertion that they lacked access to inside information, taken as true for purposes of this motion, satisfies part of the test. There are no facts alleged in plaintiffs' complaint, however, which would indicate that plaintiffs' sale of C–H stock was "involuntary" or that it was "utterly unable to control the course of events." Although plaintiffs allege that C–H forced the sale (complaint ¶¶ 30 and 31) and that the sale was the result of plaintiffs' fears (complaint ¶ 19), the conclusory assertion that the sale was forced by C–H is belied by the factual allegations of the complaint. The acts which allegedly forced the sale were the issuance of C–H preferred stock to Koppers Company and the institution of litigation by C–H against Tyco. This activity, however, took place on April 10, 1978 (complaint ¶¶ 12, 13). Despite these allegedly coercive actions, Tyco subsequently purchased an additional 1,374,100 shares of C–H stock (65% of its total holdings) and paid a total of $67,537,-680. (72% of the price of its total holdings) for these additional shares. Acts occurring prior to many of Tyco's purchases cannot be viewed as coercing a subsequent sale of that very stock, especially in view of Tyco's admission that many of its purchases of C–H stock were made "in the face of [the coercive] developments" (complaint ¶ 14).

In addition, the bare allegation that the sale was the result of plaintiffs' fears, even if accepted as true, is insufficient to establish that the sale was involuntary. Although plaintiffs had the option to maintain their ownership interest in C–H stock, they chose not to exercise that option. The fact that plaintiffs may have found it to be more financially advantageous to sell their C–H stock on June 12, 1978 than at a later time cannot be a basis for characterizing the sale transaction as involuntary.[6]

■ Plaintiffs have also raised an affirmative defense in their complaint in an attempt to avoid section 16(b) liability. They contend that C–H's conduct allegedly forcing Tyco to sell its C–H stock estops C–H from recovering Tyco's short-swing profits under the doctrine of equitable estoppel. It is well-settled in this Circuit that the defense of equitable estoppel is insufficient as a matter of law in section 16(b) actions. *Newmark v. RKO General, Inc.*, 294 F.Supp. 358, 367 (S.D.N.Y.1968), *aff'd*, 425 F.2d 348 (2d Cir.), *cert. denied*, 400 U.S. 854, 91 S.Ct. 64, 27 L.Ed.2d 91 (1970) (short-swing transaction overwhelmingly approved by shareholders); *Roth v. Fund of Funds, Ltd.*, 405 F.2d 421, 422–23 (2d Cir. 1968), *cert. denied*, 394 U.S. 975, 89 S.Ct. 1469, 22 L.Ed.2d 754 (1969) (short-swing transaction occurred at the incentive of issuer); *Magida v. Continental Can Co., Inc.*, 231 F.2d 843, 846 (2d Cir.), *cert. denied*, 351 U.S. 972, 76 S.Ct. 1031, 100 L.Ed. 1490 (1956) (short-swing transaction instigated by and for benefit of issuer); *Schur v. Salzman*, 365 F.Supp. 725, 733 (S.D.N.Y.1973) (short-

---

**6.** The Court notes that other courts have uniformly rejected "forced sale" defenses to section 16(b) liability premised on similar if not more compelling facts than are presented here. *Western Auto Supply Company v. Gamble-Skogmo, Inc.*, 348 F.2d 736, 742 (8th Cir. 1965), *cert. denied*, 382 U.S. 987, 86 S.Ct. 556, 15 L.Ed.2d 475 (1966) (sale pursuant to antitrust consent decree); *Oliff v. Exchange Intern. Corp.*, 449 F.Supp. 1277, 1293–95 (sale to estate to avoid certain federal income tax penalties); *Makofsky v. Ultra Dynamics Corp.*, 383 F.Supp. 631, 635–36 (S.D.N.Y.1974) (sale by defendant to raise cash to avoid defaulting on its contractual obligation); *American Standard, Inc. v. Crane Co.*, 346 F.Supp. 1153, 1163–64

(S.D.N.Y.1972), *rev'd on other grounds*, 510 F.2d 1043 (2d Cir. 1974), *cert. denied*, 421 U.S. 1000, 95 S.Ct. 2397, 44 L.Ed.2d 667 (1975) (sale to avoid threatened anti-trust litigation); *Alloys Unlimited, Inc. v. Gilbert*, 319 F.Supp. 617, 618 (S.D.N.Y.1970) (sale by bank of stock held as collateral imputed to pledgor of stock). In each of these cases the court observed that the seller was not truly "forced" because the ability to influence the timing of the transaction was retained. *See, e. g., Makofsky v. Ultra Dynamics Corp., supra*, 383 F.Supp. at 643 ("[defendant] put its own head in the lion's mouth, and . . . it retained at least some power to get out of it.")

swing transaction participated in by issuer); *Allied Artists Pictures Corp. v. Giroux*, 312 F.Supp. 450, 451 (S.D.N.Y.1970) (short-swing transaction benefited issuer); *Volk v. Zlotoff*, 285 F.Supp. 650, 655–56 (S.D.N.Y. 1968) (short-swing transaction intended to benefit issuer); *Marquette Cement Manufacturing Co. v. Andreas*, 239 F.Supp. 962, 966 (S.D.N.Y.1965) (short-swing transactions concurred in by issuer). *See also Cutler-Hammer, Inc. v. Leeds & Northrup Co.*, 469 F.Supp. 1021, 1023 (E.D.Wisc.1979); *Jefferson Lake Sulphur Co. v. Walet*, 104 F.Supp. 20, 23–24 (E.D.La.1952), *aff'd*, 202 F.2d 433 (5th Cir.), *cert. denied*, 346 U.S. 820, 74 S.Ct. 35, 98 L.Ed. 346 (1953). Thus, assuming for purposes of this motion that Tyco was coerced by C–H to sell its C–H stock the defense of equitable estoppel would not bar imposition of section 16(b) liability.

In conclusion, the Court finds that plaintiffs' extensive cash purchases of C–H stock after becoming a 10% stockholder and subsequent sale of their entire block of C–H stock within approximately two months subjects them to liability under section 16(b).[7] The Court also finds that plaintiffs have raised no cognizable defense to imposition of this liability.

Accordingly, defendant's motion for judgment on the pleadings upon its counterclaim is granted and plaintiffs' motion to amend and supplement their complaint is denied.

Settle judgment on notice.

---

**7.** Section 16(b) requires that the insider disgorge the maximum profit obtained under a rule of lowest-price-in and highest-price-out within six months. *Gratz v. Claughton*, 187 F.2d 46, 51 (2d Cir.), *cert. denied*, 341 U.S. 920, 71 S.Ct. 741, 95 L.Ed. 1353 (1951); *Smolowe v. Delendo Corp.*, *supra*, 136 F.2d at 239; *Western Auto Supply v. Gamble-Skogmo, Inc.*, *supra*, 348 F.2d at 743. While C–H's counterclaim seeks to recover the profits from all purchases and sales occurring within the six-month period ending June 12, 1978, defendant concedes that only those profits realized as a result of the sale of C–H stock purchases while Tyco was a ten percent owner are recoverable.