**LANE BRYANT, INC., and Norman D. Blotner, Plaintiffs,**

v.

**HATLEIGH CORPORATION, Defendant.**

**No. 81 Civ 941.**

United States District Court,
S. D. New York.

July 10, 1981.

retirement plans to take account of the "offset" provision that will apply in the future. *Id.* at 72.

Weil, Gotshal & Manges, New York City, for plaintiffs; Dennis J. Block, Richard A. Rothman, Surie Rudoff, New York City, of counsel.

Jacobs, Persinger & Parker, New York City, for defendant; I. Michael Bayda, Joshua Levine, New York City, of counsel.

## DECISION AND OPINION

MILTON POLLACK, District Judge.

THE COURT: This suit seeks a recovery from a former stockholder of Lane Bryant, Inc. pursuant to Section 16(b) of the Securities and Exchange Act of 1934 on the ground that the defendant during a period of less than six months, and while the beneficial owner of more than 10 percent of the equity common stock of the corporation, realized profits through the purchase and sale of the corporate plaintiff's securities. This Court has jurisdiction over the suit pursuant to Section 27 of the Exchange Act, 15 U.S.C. Section 78aa. For the reasons indicated hereafter, the plaintiff corporation is entitled to recover from the defendant.

The plaintiff Lane Bryant, Inc., ("Lane Bryant") is a Delaware corporation with its principal place of business in New York City. Its common stock is registered with the Securities and Exchange Commission. Pursuant to Section 12(g) of the Securities Exchange Act of 1934, 15 U.S.C. Section 78*l* and its common stock is traded on the New York Stock Exchange.

The defendant is a corporation organized and existing under the laws of the Province of Ontario, Canada, with its principal place of business in Ontario, Canada. At the times relevant herein the defendant was an investment holding company whose subsidiaries were engaged in a variety of businesses, including racetracks, restaurants, and natural gas production and distribution. The defendant's purchases and sales to be described herein were made by use of the means and instrumentalities of interstate commerce and by use of the mails and some of the purchases were made through the facilities of the New York Stock Exchange in the Southern District of New York.

The defendant's purchases of the shares of Lane Bryant common stock commenced on December 6, 1979. By March, 1980, it had become the beneficial owner of 472,700 shares of Lane Bryant common stock, an amount in excess of 10 percent of the outstanding shares of Lane Bryant common stock. Thereafter, and at all times from March 26, 1980 until February 13, 1981, the defendant was the beneficial owner of more than 10 percent of Lane Bryant common stock.

During the 6-month period from August 15, 1980 to February 13, 1980, the defendant purchased 160,100 shares of Lane Bryant common stock at a total purchase price, including brokerage commissions of $3,032,612.50. On February 13, 1981, Lane Bryant and the defendant entered into an agreement pursuant to which the defendant

sold all of its Lane Bryant stock to Lane Bryant, consisting of 700,900 shares for an aggregate purchase price of $16,120,700, or $23 per share. (U.S. dollars.) The sales agreement expressly stated that Lane Bryant reserved any and all rights to bring any action that may exist under Section 16(b) of the Securities Exchange Act of 1934, as amended. The agreement cautioned that nothing contained therein should be deemed to be an acknowledgment that Lane Bryant has a valid claim under Section 16(b).

Within 5 days of the date of sale, Lane Bryant filed the complaint herein to recover alleged short swing profits from the defendant on the common stock of Lane Bryant. The complaint was served on February 23, 1981, and an answer denying liability was filed on March 18, 1981.

In March, 1980 Lane Bryant brought an action in this court against the defendant and others, seeking to enjoin the defendant from purchasing or voting any Lane Bryant common stock and to require the defendant to divest itself of its Lane Bryant holdings. In October, 1980, the defendant requested representation on Lane Bryant's board of directors, which was refused, and Lane Bryant proposed that the defendant sell its Lane Bryant holdings to Lane Bryant at a premium.

In November, 1980, the defendant requested from Lane Bryant a list of Lane Bryant's stockholders. Lane Bryant refused that request and the defendant commenced a proceeding in the Delaware Chancery Court to obtain such a list and its application therefor was granted on February 12, 1981. The defendant filed an appropriate form with the SEC reflecting its intention to engage in a proxy contest with Lane Bryant management, and Lane Bryant continued to indicate that it would resist, and in fact increased its indebtedness in order to redeem part of its outstanding common shares.

In the face of this opposition the defendant decided to discontinue its contest for control, and on February 13, 1981, entered into the agreement mentioned above with Lane Bryant.

The statute expressly provides, "every person who is directly or indirectly the beneficial owner of more than 10 percentum of any class of any equity security (other than an exempted security) which is registered pursuant to Section 12 . . . is subject to the liabilities set forth in Section 16(b) of the Act," which reads "for the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner . . . any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than 6 months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner . . . in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months." Plaintiff alleges herein that during the six month period prior to the sale of the stock on February 13, 1981 the defendant purchased 160,100 shares of Lane Bryant upon which it subsequently realized short-swing profits of 649,687.50. The statute and the cases have made clear that such profit may be recovered by the issuer, in this case Lane Bryant, regardless of the intention of the beneficial owner in entering into the transaction. While the purpose of the law was to prevent the unfair use of information which may have been obtained by insiders, the liability of an insider for short-swing profits is not dependent on proved or actual use of inside information. If there is a short-swing profit by an insider and the transaction is not within any of the exceptions set forth by the Securities and Exchange Commission in its regulations pursuant to the Act, liability is imposed regardless of good faith. None of the exceptions provided with respect to a purchase and sale of corporate securities by insiders apply to the transactions in this suit (see 17 CFR Section 240.16 et seq.)

The defendant urges this court to reject the so-called "objective standard" whereby a beneficial owner of more than 10 percent of any class of equity security is automatically liable for short-swing profits made on the purchase and sale or sale and purchase of such securities within a period of less than 6 months. Instead, relying on *Kern County Land Co. v. Occidental Petroleum Corporation*, 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973) defendant suggests that this Court should adopt towards the defendant's transactions, the "pragmatic approach." Under this approach, the defendant argues that it would not be liable because it had no access to inside information, and hence there was no possibility of the speculative abuse against which Section 16(b) was directed.

The "objective standard" for Section 16(b) liability was set out in *Smolowe v. Delendo Corp.*, 136 F.2d 231 (2d Cir. 1943).

"The Congressional hearings indicate that Section 16(b), specifically, was designed to protect the 'outside' stockholders against at least short-swing speculation by insiders with advance information. It is apparent too, from the language of Section 16(b) itself, as well as from the Congressional hearing, that the only remedy which its framers deemed effective for this reform was the imposition of a liability based upon an objective measure of proof . . .

Had Congress intended that only profits from an actual misuse of inside information should be recoverable, it would have been simple enough to say so. Significantly, however, it makes recoverable the profit from any purchase and sale, or sale and purchase, within the period. The failure to limit recovery to profit gained from misuse of information justifies the conclusion that the preamble was inserted for other purposes than as a restriction on the scope of the Act." 136 F.2d at 235–36.

Similarly, in *Reliance Electric Company v. Emerson Electric Company*, 404 U.S. 418, 422, 92 S.Ct. 596, 599, 30 L.Ed.2d 575 (1972), the Supreme Court, quoting the 7th Circuit, stated:

"In order to achieve its goals, Congress chose a relative arbitrary rule capable of easy administration. The objective standard of Section 16(b) imposes strict liability upon substantially all transactions occurring within the statutory time period, regardless of the intent of the insider or the existence of actual speculation. This approach maximized the ability of the Rule to eradicate speculative abuses by reducing difficulties in proof. Such arbitrary and sweeping coverage was deemed necessary to insure the optimum prophylactic effect." *Bershad v. McDonough*, 428 F.2d 693, 696.

In *Kern County, supra*, however the Supreme Court adopted a "pragmatic" approach for "unorthodox" or "borderline" transactions. In that case, the issue presented was whether a Section 16(b) "sale" occurred "when the target of a tender offer defends itself by merging into a third company and the tender offeror then exchanges the stock for the stock of the surviving company and also grants an option to purchase the latter's stock that is not exercisable with the statutory 6-month period." 411 U.S. at 584, 93 S.Ct. at 1739. After considering the purpose of Section 16(b), the Supreme Court stated:

"Although traditional cash-for-sale stock transactions that result in a purchase and sale or a sale and purchase within the six-month, statutory period are clearly within the purview of Section 16(b), the courts have wrestled with the question of inclusion or exclusion of certain 'unorthodox' transactions. Id. at 593, 93 S.Ct. at 1744.

As examples of unorthodox transactions, the Supreme Court cited: "Stock conversions, exchanges pursuant to mergers and other corporate reorganizations, stock reclassifications and dealings in options, rights, and warrants." Id. at 593 n. 24, 93 S.Ct. at 1744.

The Supreme Court went on to adopt a pragmatic test for "unorthodox" or "borderline" transactions, under which the relevant question became whether such trans-

action "may serve as a vehicle for the evil which Congress sought to prevent—the realization of short swing profits based upon access to inside information." Id. at 594, 93 S.Ct. at 1744. The court did not rule, however, that a merger or contest for control may never result in a Section 16(b) violation. Id. at 600, 93 S.Ct. at 1747. *American Standard, Inc. v. Crane Co.*, 510 F.2d 1043, 1054 (2nd Cir. 1974) or that the objective test would never be appropriate in such context. The court then proceeded to examine the particular facts of the case and held the defendant not liable on the ground that "the involuntary nature of Occidental's exchange when coupled with the absence of the possibility of speculative abuse of inside information convinces us that Section 16(b) should not apply to transactions such as this one."

Courts subsequently have interpreted *Kern County* as adopting the pragmatic approach for unorthodox transactions but retaining the objective standard for voluntary cash-for-stock transactions. For example, in *Lewis v. Varnes*, 505 F.2d 785, 789 (2nd Cir. 1974) the Second Circuit stated that courts "are free to adopt such a flexible [pragmatic] approach in construing Section 16(b) only in those cases where the relevant provision is either intrinsically ambiguous or in which there are alternative plausible applications of the provision to a particular factual situation." See *Allis-Chalmers Mfg. Co. v. Gulf & Western Industries, Inc.*, 527 F.2d 335, 351 (7th Cir.) cert. denied, 423 U.S. 1078, 96 S.Ct. 865, 47 L.Ed.2d 89 (1976). (The Court [in *Kern County*] did not suggest that ordinary voluntary transactions commonly recognized as purchases and sale would not automatically trigger the application of Section 16(b) in future cases as they uniformly have in the past." *Lewis v. Arcara*, 401 F.Supp. 449, 452 (S.D.N.Y.1975) (Weinfeld, J.) ("With the exception of unorthodox transactions not clearly within the reach of the statute which require judicial inquiry to determine whether the opportunity for speculative abuse exists, Section 16(b) is to be objectively and automatically applied. . . ."); *Tyco Laboratories v. Cutler-Hammer, Inc.*, 490 F.Supp. 1, 6 (S.D.N.Y. 1980) (Ward, J.) ("Nowhere in Kern County . . . did the Supreme Court state or suggest that a 'control contest type of situation' makes a securities transaction 'unorthodox.' On the contrary, what the Supreme Court actually states is that a 'cash-for-stock' transaction is orthodox and results in automatic Section 16(b) liability.")

The Second Circuit decision that comes closest to supporting the defendant's argument is *American Standard Inc. v. Crane Co., supra*. In that case, defendant Crane purchased more than 10 percent of the stock of Western Air Brake Company in a contested tender offer. Crane lost the contest when Air Brake effected a merger into American Standard. As a result of the merger, Crane's stock in Air Brake was converted into American Standard stock which Crane subsequently sold on the market. The Second Circuit applied the pragmatic approach and held Crane not liable.

Although dicta in the opinion may seem to support defendant's contention, the dicta reading "the teaching of *Kern County* is that for Section 16(b) liability there must be a likelihood of access to inside information 'by reason of its ownership of more than 10% of the outstanding shares." The holding itself is limited to the finding that there was no "purchase" and "sale". Moreover, the Court noted that the application of the pragmatic approach "has thus far been limited to situations where there has been a 'conversion' of securities, rather than a purchase or sale for cash." *Id.* at 1060.

■ Under the case law, it appears that the objective test should clearly apply to the instant case since the defendant here both purchased and sold plaintiff's stock for cash and, while there was a contest for control, this case differs from Kern County and American Standard, where the target merged with a third corporation, causing the defendant tender offeror to become a minority shareholder in the third corporation, in that here there was no defensive merger, but rather the defendant simply decided it was unprofitable to pursue the proxy contest.

*Tyco Laboratories Inc. v. Cutler-Hammer, Inc., supra,* supports such a holding. There, Tyco attempted to obtain control of Cutler-Hammer through a purchase of its shares. The latter resisted by various means, including the sale of 20 percent of its stock to a third corporation (though the third corporation itself never gained control). Tyco subsequently sold all its shares of Cutler-Hammer, some of which had been purchased within 6 months. Tyco, in moving for summary judgment, argued that "inasmuch as their purchases of Cutler-Hammer stock and the sale of that stock ... occurred in the context of 'a control contest type of situation', the sale was an 'unorthodox' transaction within the Kern County exception to Section 16(b) liability." 490 F.Supp. at 5. The district court rejected this argument and applying the objective test held Tyco liable. In relevant part, the court stated:

"As defendant Cutler-Hammer points out, no case either before or after Kern County has exempted cash-for-stock transactions from the automatic application of Section 16(b) and, with a single exception, every case holding a transaction to be 'unorthodox', and thus exempt from the 'automatic' application of Section 16(b), has involved a 'conversion.' In short, plaintiffs [Tyco] have utterly failed to convince this court that deviation from the express terms of the statute or the case law interpreting it, is justified here. Accordingly, the Court concludes that plaintiffs' cash-for-stock sale of its holdings of Cutler-Hammer stock to Eaton within six months of becoming a ten percent shareholder was an orthodox transaction subjecting plaintiffs to automatic Section 16(b) liability." *Id.* at 6–7. (footnotes omitted)

In accord, see *Cutler-Hammer Inc. v. Leeds & Northrup Co.,* 469 F.Supp. 1021 (E.D.Wis.1979) ("The transactions at bar may be fairly characterized as voluntary purchases and sales of securities for cash. As such, it is clear that they are not among those defined by the Court in *Kern County* as unorthodox. The Court clearly distinguished voluntary cash-for-stock transactions from unorthodox ones...")

Even if this Court were to apply the pragmatic approach, however, it appears that the defendant should be liable. In *Tyco, supra,* at 7–8, the Court stated:

"Two factors must exist in order to remove even an 'unorthodox' transaction from the ambit of Section 16(b) liability: (1) the transaction must be involuntary, and (2) the transaction must present no possibility of speculative abuse. *Kern County Land Co. v. Occidental Petroleum Corp., supra,* 411 U.S. at 600 [93 S.Ct. at 1747] .... As the Second Circuit stated: "The emphasis in Mr. Justice White's opinion was on two factors: (1) The unlikelihood of actual access to inside information in an atmosphere of hostility by a party adverse in interest; and (2) the utter inability of the unsuccessful party to control the course of events."

(quoting *American Standard, supra,* at 1054.)

To be compared with the foregoing, see *Allis Chalmers Mfg. Co. v. Gulf & Western Industries, Inc., supra,* at 351 ("In order to avoid this automatic rule under the *Kern* rationale, it would have to be shown (1) that either the purchase or sale was an unorthodox transaction, and (2) that an analysis of the unorthodox transaction discloses no possibility of short-term speculative abuse.")

It is noteworthy that neither the Supreme Court in *Kern County* nor the Second Circuit in *American Standard* specifically answer the question whether one or both of the two conditions must be shown in order to avoid liability under the "unorthodox" transaction exception. Defendant argues that lack of inside information is sufficient, but is unable to cite and has failed to cite cases directly in support. Under the case law, defendant's sale of stock could not be called involuntary. See *Tyco, supra,* at 8 ("Although plaintiffs had the option to maintain their ownership interest in Cutler-Hammer stock, they chose not to exercise that option. The fact that the plaintiffs may have found it to be more

financially advantageous to sell their Cutler-Hammer stock on June 12, 1978 than at a later time could not be a basis for characterizing the sale transaction as involuntary."); *Sprague Electric Co. v. Mostek Corp.*, 488 F.Supp. 842, 845 (N.D.Tex.1980) ("Case law establishes a stiff test of voluntariness. So long as the seller retains any degree of control over a transaction, its actions will not be found to be involuntary. As the court held in *Makofsky v. Ultra Dynamics Corp.*, 383 F.Supp. 631, 643 (S.D.N.Y.1974), a sale is not 'forced' when the seller 'put its own head in the lion's mouth, and . . . retained at lease [sic] some power to get out of it.'"

Defendant seeks to reduce the amount of profits sought to be recouped from the $649,687.50 alleged by the plaintiff, to $486,567.53 on the grounds that there should be deducted from the profits administrative overhead expenses of $9,200 and interest on the loans secured with which to make the purchases of the stock amounting to $135,919.97.

The defendant also suggests further deductions for office overhead in the sum of $5,500 for the six-month period involved and its lawyers' fees and costs of litigation referred to above, totalling $383,000.

■ None of these attempted deductions is appropriate in calculating the short-swing profits. The profits on the purchases and sales are not to be equated with the costs to the defendant of doing business, nor conducting litigation seeking the control of the enterprise. It would be inappropriate to permit the bank's administrative charges for handling the defendant's account or its interest charges on loans which the defendant secured to enable it to finance the purchases to reduce the profit on the trades.

The profits contemplated by the statute are profits from the purchase and sale of the securities and not any costs such as bank charges, office overhead or collateral litigation which a party seeking control incurs. To permit the deductions claimed would be to encourage the type of transactions from which the statute squeezes all profit to be made on the basis of third party financing of the transactions which by itself would merely multiply the problems sought to be reached by Section 16(b).

■ The plaintiff seeks and the defendant opposes the awarding of prejudgment interest. An assessment of prejudgment interest in this case would involve interest from the time that the demand for repayment was served, namely the date of the service of the complaint, or possibly the date on which the answer denying liability was filed, which was some three weeks later. There has been no substantial showing of bad faith or other inequitable conduct by defendant.

Prejudgment interest is within the discretion of the Court, given in response to considerations of fairness. Accordingly, plaintiff's request for prejudgment interest is denied.

The foregoing shall constitute the findings of fact and conclusions of law in pursuance of Rule 52(a) of the Federal Rules of Civil Procedure. Judgment may be entered accordingly in favor of Lane Bryant, Inc. against Hatleigh Corporation in the sum of $649,687.50, together with costs to be taxed by the Clerk.

It is so ordered.