**TEXAS INTERNATIONAL AIRLINES, Plaintiff-Appellant,**

v.

**·NATIONAL AIRLINES, INC., Defendant-Appellee.**

**No. 82–2215.**

United States Court of Appeals, Fifth Circuit.

Sept. 15, 1983.

Alvin M. Owsley, Jr., Joseph A. Cialone, II, Houston, Tex.; George A. Davidson, New York City, for plaintiff-appellant.

David T. Harvin, Houston, Tex., Martin S. Thaler, Richard J. Morvillo, Washington, D.C., for defendant-appellee.

Before GARZA, POLITZ and JOHNSON, Circuit Judges.

JOHNSON, Circuit Judge:

Texas International (TI) appeals the grant of summary judgment for National Airlines (National) holding TI liable to National under section 16(b) of the Securities Exchange Act of 1934 (the Exchange Act) for the "short swing profits" made on the sale of 121,000 shares of National common stock. Section 16(b), 15 U.S.C.A. § 78p(b) provides, in pertinent part:

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of

such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months.

The three factors which trigger section 16(b) liability were all present—TI was a ten percent beneficial owner of National that purchased and sold National stock within a six-month period. The district court, therefore, found TI subject to automatic section 16(b) liability to National for the short swing profits TI made on the sale.[1] On appeal, TI argues that equity bars any recovery by National and, in the alternative, that proof of "nonaccess" to inside information should be decisive in a section 16(b) inquiry. This Court affirms the grant of summary judgment for National.

### Facts

On March 14, 1979, during an attempt by TI to gain control of National, TI purchased 121,000 shares of National common stock in open market brokerage transactions.[2] On March 14, the date of the purchase, TI was a beneficial owner of more than ten percent of National's common stock. On July 28, 1979, within six months of the March 14 purchase, TI and Pan American World Airways, Inc. (Pan Am) entered into a stock purchase agreement whereby TI agreed to sell 790,700 shares of National common stock to Pan Am at $50 per share.[3] The closing was held on July 30, 1979. Under the matching rules of section 16(b) the 790,-

700 shares sold by TI on July 28, 1979 are deemed to include the 121,000 shares purchased by TI in March.

On September 6, 1978, National and Pan Am[4] had entered into a merger agreement which provided for the merger of National into Pan Am contingent upon certain conditions and, in connection with the merger, for the exchange by Pan Am of not less than $50 in cash for each share of National common stock, other than the shares held by Pan Am. On May 16, 1979, National stockholders approved the merger agreement dated September 6, 1978, as amended. TI, as a National stockholder, stood to receive $50 per share for its National stock if and when the merger closed. For whatever reason, TI decided not to wait until the merger went through to negotiate for the disposition of its holdings to Pan Am. It was not until after the July 28, 1979 sale by TI of its National stock to Pan Am that the National-Pan Am merger was effectuated.

On August 2, 1979, only five days after TI sold its National stock to Pan Am, TI sought declaratory relief[5] that it was not liable to National under section 16(b) for profits realized on the purchase and sale of National common stock. In the alternative, TI sought to reduce its short swing profits by deducting expenses it allegedly incurred in connection with the purchase and sale of its National stock. On September 26, 1979, National counterclaimed, seeking recovery of TI's short swing profits under section

1. The district court recognized the narrow "unorthodox" transaction exception to § 16(b) but held that TI's purchase and sale did not fit within this exception.

2. These transactions were as follows: 11,000 shares at $40 per share; 10,000 shares at $40⅛ per share; 4,500 shares at $40⅜ per share; 95,500 shares at $40½ per share. The aggregate purchase price for the 121,000 shares was $4,890,687.50, including brokerage commissions of $9,680.00. At all relevant times, National's common stock was listed on the New York and Pacific Stock Exchanges and registered with the Securities and Exchange Commission pursuant to § 12(b) of the Exchange Act.

3. Pursuant to the agreement, Pan Am also agreed to pay TI the sum of $3,000,000 for an option to purchase the remaining 1,309,300 shares owned by TI. In November 1979, Pan Am exercised the option, which is not an issue on appeal.

4. Pan Am Florida, Inc., a subsidiary of Pan Am, was also a party to the agreement.

5. TI sought declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 & 2202.

16(b). National moved for summary judgment on November 24, 1980.[6]

On May 11, 1981, the district court granted National's motion in part, finding that TI's purchase and sale of the 121,000 shares of National stock constituted a violation of section 16(b). The district court squarely rejected TI's contention that the control contest situation rendered the transaction at issue "unorthodox" within the meaning of *Kern County Land Co. v. Occidental Petroleum Corp.,* 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973). In reaching its conclusion that TI was liable under section 16(b), the district court stated that no court has exempted the type of transaction at issue here—a cash-for-stock transaction—from the automatic application of section 16(b). The court also determined that TI could deduct from the short swing profits for which it was liable, brokerage commissions, transfer taxes, and other incidental expenses incurred in the purchase and sale of the 121,000 shares of National common stock. However, the court ordered TI to submit a breakdown of its claimed expenses incident to the purchase and sale. Following further submissions by both parties, the district court entered an order on March 31, 1982, allowing TI to deduct brokerage commissions and transfer taxes in the amount of $10,117.50 from the short swing profits for which it was liable. The court disallowed, however, all of TI's other requested expense deductions as not incidental to the purchase and sale of the 121,000 shares of National stock. On May 10, 1982, the district court issued its final judgment, dismissing TI's complaint for declaratory judgment and awarding National the sum of $1,149,195 on its counterclaim, together with prejudgment interest and costs.

### Equitable Estoppel

In making its argument that equitable estoppel should be allowed as a defense in a section 16(b) action, TI first states the purpose of section 16(b): the evil Congress sought to curb was market speculation by corporate insiders based on abuse of their positions of trust and access to confidential information. TI urges that section 16(b) embodies the equitable remedy of restitution traditionally imposed on fiduciaries. If a fiduciary profits by inside information concerning the affairs of his principal, the fiduciary's profits go to the principal. Given that the section is merely an application of an equitable doctrine, equitable defenses must be allowed, according to TI. TI eschews the section 16(b) cases disallowing equitable defenses as a matter of law by claiming that the instant case is factually distinguishable from those cases. Here, TI urges, there are no innocent outside stockholders of the issuer who need protection. Rather, Pan Am, the only party that would benefit from a recovery, is the very party that has engaged in conduct giving rise to an estoppel. This conduct, according to TI, consisted of Pan Am's involvement in the transaction that created section 16(b) liability at a time when Pan Am was the controlling stockholder of National and had an agreement in place requiring the shareholders to accept $50 for their shares.

The case law uniformly rejects equitable defenses in section 16(b) cases. *See, e.g., Roth v. Fund of Funds, Ltd.,* 405 F.2d 421, 422–23 (2d Cir.1968), *cert. denied,* 394 U.S. 975, 89 S.Ct. 1469, 22 L.Ed.2d 754 (1969); *Magida v. Continental Can Co.,* 231 F.2d 843, 846 (2d Cir.), *cert. denied,* 351 U.S. 972, 76 S.Ct. 1031, 100 L.Ed. 1490 (1956); *Tyco Laboratories, Inc. v. Cutler-Hammer, Inc.,* 490 F.Supp. 1, 8 (S.D.N.Y.1980); *Cutler-Hammer, Inc. v. Leeds & Northrup Co.,* 469 F.Supp. 1021, 1023 (E.D.Wis.1979). The facts of this case do not warrant an aberration from the principle that holds equitable defenses in section 16(b) cases insufficient as a matter of law. Indeed, the courts have not accepted equitable defenses even in cases where the issuer participated in the transaction or where the transaction giving rise to the profit occurred at the incentive of the issuer itself. *See, e.g., Roth,* 405 F.2d at 422–23; *Magida,* 231 F.2d at 846.

---

**6.** By early January 1980, the merger of Pan Am and National had been effectuated. Pan Am became the surviving corporation.

Although disgorgement of profits benefits the shareholders of the issuer, the courts do not entertain equitable defenses which could operate to bar recovery by these shareholders. This Court is not disposed to create an exception to the disallowance of equitable defenses in section 16(b) cases based on the mere difference that in this instance Pan Am, who participated in the section 16(b) transaction, was a shareholder of the issuer (National) who subsequently merged into its shareholder (Pan Am). Allowance of equitable defenses in section 16(b) cases would only serve to thwart the remedial purpose of the statute.

TI places great reliance in a recent case of this Circuit, *Regional Properties v. Financial & Real Estate Consulting Co.,* 678 F.2d 552 (5th Cir.1982) for the proposition that equitable remedies created by the federal securities laws may be barred by equitable defenses. *Regional Properties* held that a defendant in a suit brought under section 29(b) of the Exchange Act may invoke traditional equitable defenses. *Regional Properties,* however, is of no avail to TI in this section 16(b) case. The question this Court faced in *Regional Properties* was whether real estate developers were entitled to rescind their agreements with the broker under the contract-voiding provisions of section 29(b) of the Exchange Act. An action for rescission of a contract is by its very definition equitable in nature. In the instant case, the question before this Court is not whether the contract between TI and National was void, but whether the profits which were obtained by TI were precluded by § 16(b) and were recoverable by National under the provisions of the statute. Indeed, the reasons this Court gave for allowing equitable defenses in section 29(b) actions are inapposite to the section 16(b) action before the Court. The first rationale used in *Regional Properties* was that, historically, a suit to void a contract sounds in equity and that actions to void a securities broker's contract are therefore equitable in nature. The case before this Court is not an action to rescind a contract—it is an action to disgorge precluded profits. The second rationale used

in *Regional Properties* was that Supreme Court statements favored allowing equitable defenses in section 29(b) actions. In *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 623, 24 L.Ed.2d 593 (1970), the Supreme Court in dictum acknowledged the availability of one equitable defense, *in pari delicto,* in a section 29(b) action. Additionally, in *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 246–47, 62 L.Ed.2d 146 (1979), the Supreme Court in dictum noted with approval the general reading of section 29(b)-type provisions by the lower federal courts as "implying an equitable cause of action for rescission ...." But not even in dicta has the Supreme Court made statements favoring the allowance of equitable defenses in section 16(b) actions. Moreover, this Court in *Regional Properties* opted to allow all the traditional equitable defenses in section 29(b) actions because "virtually all other courts that have decided this issue" have held that equitable defenses are available. On the other hand, the only courts that have addressed the issue in the context of section 16(b) have rejected the allowance of equitable defenses. In sum, none of the reasons justifying this Court's decision in *Regional Properties* to allow equitable defenses in section 29(b) actions is present in the instant case.

Finally, this Court's decision to allow equitable defenses in *Regional Properties* was consistent with the facts of that case. There, the broker had represented to the plaintiff-developers that he was a knowledgeable financial consultant and expert in the tax and legal aspects of limited partnerships and in federal and state securities laws. In fact, however, he was a disbarred attorney who was not registered as a broker, who was inexperienced in limited partnerships, and who was ignorant of federal securities law requirements for either private placements or public offerings of limited partnership interests. Significantly, TI makes no claim of misrepresentations or nondisclosures on the part of Pan Am in this case. Indeed, even were this Court to allow equitable defenses, this Court is un-

convinced that the equities favor TI. Fully anticipating both the merger and the possible—if not probable—applicability of section 16(b),[7] TI voluntarily entered into the transaction with Pan Am. TI appears to have made a considered and calculated business judgment in its purchase and sale of its National shares, and to have derived therefrom a substantial profit. Indeed, were this Court to allow TI to escape section 16(b) liability, the result would be a pure windfall to TI. TI, which voluntarily decided to sell its shares to Pan Am before the merger closed, benefited from the use of the sales proceeds during the remaining portion of the statutory period. The facts of the instant case, hardly akin to the facts in *Regional Properties,* supply no motivation for the allowance of equitable defenses in a section 16(b) action.

### A Standard of Nonaccess to Inside Information

TI urges this Court to create an exception to automatic section 16(b) liability in cases where a defendant can prove that, notwithstanding its ownership of over ten percent of the stock of the issuer, the defendant had no access to inside information concerning the issuer. According to TI, the classic example of such a case is a sale of stock in the hostile takeover context. Application of section 16(b) in this type of case, argues TI, does not serve congressional goals—Congress intended short-swing profits to be disgorged only when the particular transaction serves as a vehicle for the realization of these profits based upon access to inside information.

TI's argument is unsupported by the legislative history of section 16(b). Although the abuse Congress sought to curb was speculation by stockholders with inside information, "the only method Congress deemed effective to curb the evils of insider trading was a *flat rule* taking the profits out of a *class of transactions* in which the

possibility of abuse was believed to be intolerably great." *Kern County,* 93 S.Ct. at 1473 (emphasis added). In explaining the necessity for a "crude rule of thumb" to Congress, Thomas Corcoran, a principal draftsman of the Act, stated: "You have to have a general rule. In particular transactions it might work a hardship, but those transactions that are a hardship represent the sacrifice to the necessity of having a general rule." Hearings on Stock Exchange Practices before the Senate Committee on Banking and Currency, 73d Cong., 2d Sess., 6557 and 6558 (1934). The Supreme Court explained the necessity for the flat rule or "objective approach" of the statute in *Reliance Electric Company v. Emerson Electric Company,* 404 U.S. 418, 92 S.Ct. 596, 599, 30 L.Ed.2d 575 (1972) *quoting Bershad v. McDonough,* 428 F.2d 693, 696 (7th Cir.1970):

> In order to achieve its goals, Congress chose a relatively arbitrary rule capable of easy administration. The objective standard of Section 16(b) imposes strict liability upon substantially all transactions occurring within the statutory time period, regardless of the intent of the insider or the existence of actual speculation. This approach maximized the ability of the rule to eradicate speculative abuses by reducing difficulties in proof. Such arbitrary and sweeping coverage was deemed necessary to insure the optimum prophylatic effect.

On the basis of legislative history, the court in *Tyco,* 490 F.Supp. at 5–6, rejected the very argument advanced by TI here—that the necessary predicate to section 16(b) liability is access to inside information.

> A review of the legislative history indicates, . . . that Congress specifically envisioned a statutory scheme which imposes automatic liability on any and all ten percent shareholders who buy and sell an issuer's securities within a six-month pe-

---

**7.** TI states that its negotiations with Pan Am began only after Pan Am became a 51% shareholder of National and could thereby force shareholder approval of the 1978 merger agreement. Furthermore, TI filed its complaint for declaratory relief on August 2, 1979, five days after its sale of the 121,000 National shares.

riod, irrespective of whether they had access to or misused inside information ... Moreover, the argument that the preamble to section 16(b), which states that the statute was enacted "[f]or the purpose of preventing the unfair use of information which may have been obtained by [a] beneficial owner, director, or officer by reason of his relationship to the issuer", indicates that Congress did not intend section 16(b) to apply in absolute fashion to transactions where there was no access to inside information, has long been rejected by courts called upon to interpret the Act.... [I]f Congress intended that only profits derived by those who had access to inside information were to be recoverable under the Act, it would have been simple enough to say so. It is apparent that Congress selected such a broad, harsh mechanism because it recognized that in no other way could the purpose of the statute be fully implemented and the potential abuses of insider trading effectively controlled.

This Court is in agreement with the statements of legislative purpose as expressed by the *Tyco* court and by the Supreme Court in *Emerson Electric* and *Kern County*—the mechanical application of section 16(b) to the specified class of transactions is necessary in order to guarantee that the abuse at which the statute is aimed will be effectively curbed.

■ In *Kern County* the Supreme Court approved an extremely narrow exception to the objective standard of section 16(b). The Court held that when a transaction is "unorthodox" or "borderline," the courts should adopt a pragmatic approach in imposing section 16(b) liability which considers the opportunity for speculative abuse, i.e., whether the statutory "insider" had or was likely to have access to inside information.

TI engages in an analogy between the hostile and adversary situation that existed between the target company and the putative insider in *Kern County* and the adversary relationship between TI and National in the instant case.[8] Even assuming the alleged parallelism between the adversary situations in the two cases and assuming that TI could prove that it neither had nor was likely to have access to inside information by virtue of its statutory "insider" status, no valid basis for an exception to section 16(b) liability on these facts is perceived. The Supreme Court in *Kern County* inquired into whether the transaction had the potential for abuse of inside information only because the transaction fell under the rubric of "unorthodox" or "borderline."[9] In *Kern County,* Occidental, a shareholder in Kern County Land Company (Old Kern) converted its shares in Old Kern into shares of the acquiring corporation pursuant to a merger. The Supreme Court clearly distinguished the unorthodox transaction—a conversion of securities—before it from the traditional cash-for-stock transaction in the instant case: "traditional cash-for-stock transactions ... are clearly with-

**8.** In its brief, TI constructs this analogy as follows:

The hostile and adversary situation that existed between the target company and the putative "insider" in *Kern County* is paralleled to a remarkable degree in the facts of the present case. Like the management of Old Kern, National management wanted to avoid its own displacement to the greatest extent possible, and took immediate and vigorous steps to frustrate the efforts of Texas International to gain control. Like the management of Old Kern, National management repeatedly communicated with its stockholders to vilify Texas International and to compare its merger offers unfavorably with those of management's favorite, Pan Am. Like the

management of Old Kern, National management refused to enter into discussions with Texas International and concluded an agreement to effect a defensive merger with another company. As in *Kern County* and in accordance with the recognized pattern in unfriendly takeover situations, Texas International, as the disfavored and ultimately losing bidder for control, far from being treated as an insider, was treated as an enemy.

**9.** The Court, in a nonexhaustive list, enumerated certain transactions which are unorthodox: stock conversions, exchanges pursuant to mergers and other corporate reorganizations, stock reclassifications, and dealings in options, rights, and warrants. *Kern County,* 93 S.Ct. at 1744 n. 24.

in the purview of § 16(b)."[10]  *Kern County,* 93 S.Ct. at 1744.

TI lays frontal attack on the unorthodox transaction test as fundamentally flawed, principally because the form of consideration received—cash or stock—has nothing to do with whether inside information was or might have been used.  What this attack fails to consider, however, is the significance of the factor of voluntariness in the Supreme Court's decision.  The Court's sole concern was not that cash-for-stock sales present a greater opportunity for abuse of inside information than do stock-for-stock sales.  Rather, language in the Supreme Court's opinion indicates that traditional cash-for-stock sales were excluded from the concept of unorthodox transactions because of their voluntary nature:

> The critical fact is that the exchange took place and was required pursuant to a merger....
>
> Occidental could, of course, have disposed of its shares of Old Kern for cash before the merger was closed.  Such an act would have been a section 16(b) sale and would have left Occidental with a prima facie section 16(b) liability ....  But the *involuntary nature* of Occidental's exchange, when coupled with the absence of the possibility of speculative abuse of inside information, convinces us that section 16(b) should not apply to transactions such as this one.

*Id.* at 1747 (emphasis added).  In the instant case, TI voluntarily entered into the stock purchase agreement with Pan Am before the National-Pan Am merger was effectuated.  Despite the alleged lack of access to inside information and therefore the possibility of speculative abuse, the volitional character of the exchange is sufficient reason to trigger applicability of the language of section 16(b).[11]  For whatever reason, after the National-Pan Am merger had been approved, TI decided to take the initiative for the course of subsequent events into its own hands rather than wait for the merger to become accomplished.  These circumstances do not warrant the creation of an exception to automatic section 16(b) liability.

### Calculation of Short Swing Profits

■  In calculating the short swing profits for which TI was held liable, the district court allowed TI to deduct brokerage commissions and transfer taxes[12] incurred in the purchase and sale of TI's 121,000 shares of National common stock.  On appeal, TI complains of the district court's disallowance of the various other expenses by which it sought to reduce the amount of its profit.  TI sought deductions for borrowing and interest costs connected with its purchase and holding of the shares.  These expenses consisted of costs related to the margin loan in connection with the original purchase of the 121,000 shares[13] and an allocated portion of the public offering used by TI to refinance the initial borrowing.[14]  TI also

10.  The court in *Tyco Laboratories,* 490 F.Supp. at 6–7, stated:
> Nowhere in *Kern County,* however, did the Supreme Court state or suggest that a "control contest type of situation" makes a securities transaction "unorthodox."  On the contrary, what the Supreme Court actually stated is that a "cash-for-stock" transaction is orthodox and results in automatic section 16(b) liability.
> Moreover, ..., no case either before or after *Kern County* has exempted cash-for-stock transactions from the automatic application of section 16(b)....

11.  In finding an exchange of stock pursuant to a merger not to have been a "sale" for purposes of § 16(b), the Court in *American Standard, Inc. v. Crane Co.,* 510 F.2d 1043, 1056 (2d Cir.1974), *cert. denied,* 421 U.S. 1000, 95 S.Ct. 2397, 44 L.Ed.2d 667 (1975), considered the nonvolitional character of the exchange.

12.  These expenses amounted to $10,117.50.  TI was therefore allowed to deduct this amount from the $1,159,312.50 in short swing profits.

13.  These costs are enumerated as follows:  (1) $40,723 interest paid on the money borrowed to purchase the 121,000 shares (the margin loan);  (2) a commitment fee of $1,771 paid to the entity from which plaintiff obtained a portion of the margin loan;  (3) $10,822 in fees paid to the banks' attorneys in connection with the margin loan.

14.  The allocated portion, $238,698, represented the portion of the proceeds of the public offer-

sought deductions for various legal, investment banking, and other consulting fees.[15] This Court agrees with the district court that these costs represented nontransactional expenses which were not incidental to the purchase and sale of the 121,000 shares of National common stock.

In considering the calculation of profit under section 16(b) the need has been recognized to "squeeze every possible penny of profit out of such transactions" in order to effectuate the remedial purpose of the statute. *Blau v. Lehman,* 286 F.2d 786, 791 (2d Cir.1960), *aff'd,* 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962) *citing Smolowe v. Delendo Corp.,* 136 F.2d 231, 239 (2d Cir.), *cert. denied,* 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943). The Court in *Blau,* 286 F.2d at 791, reaffirmed this principle even though in the case before it, no confidential information had been improperly used. The Court specifically noted that the stock acquisition in that case was voluntary. *Id.* at 792.

This Court is not persuaded by the argument that accounting principles, or any other approach designed to portray profit in a realistic way, would allow a deduction of the claimed expenses in computing the profit made on the transaction. The Court is obliged to construe the term "profit" in a federal statute designed to impose strict liability on particular parties who make short swing profits within the proscribed period. As the Court in *Blau* stated: "We are not . . . computing profits in accordance with what might be the custom of traders and speculators in the stock market. We are construing a federal statute . . . ." *Id.* Indeed, the method of computing profit within section 16(b) can result in a "profit," albeit a theoretical one, even though the short swing trader has suffered a net loss from his trading during the period.[16]

In *Lane Bryant, Inc. v. Hatleigh Corp.,* 517 F.Supp. 1196, 1202 (S.D.N.Y.1981), the defendant sought to reduce the amount of profit made by (1) administrative overhead expenses, (2) interest on the loans secured to enable defendant to finance the stock purchases, (3) office overhead, and (4) lawyers' fees and costs of litigation. The Court rejected all of these proposed deductions:

None of these attempted deductions is appropriate in calculating the short-swing profits. The profits on the purchases and sales are not to be equated with the costs to the defendant of doing business, nor conducting litigation seeking the control of the enterprise. It would be inappropriate to permit the bank's administrative charges for handling the defendant's account or its interest charges on loans

---

ing that was used to refinance the 121,000 shares.

**15.** These costs are enumerated by the district court in its order of March 31, 1982, as follows:
(1) voting trust administration fees of $374 which were incurred with respect to the National shares owned by plaintiff;
(2) investment banking fees totalling $43,214;
(3) the sum of $3,666, constituting the cost of public relations, management and transportation consultants, consultation and testimony relating to the Civil Aeronautic Board proceeding to acquire National, and accounting;
(4) legal fees of $91,223;
(5) commitment fees totalling $18,343;
(6) miscellaneous disbursements of $1,926 which include the cost of printing and supplies, the unidentified expenses of certain individuals employed by plaintiff, computer services cost, transcripts costs, news clipping costs, newswire services cost, courier services, the cost of a "Texas Delegation breakfast"; and,

(7) the sum of $23,000 which constitutes estimated management and clerical time spent in support of the margin loan, floating rate note offering and the effort to acquire National from March 14 through July 30, 1979.

**16.** The "lowest-in-highest-out" rule used to calculate § 16(b) profit by the matching of particular purchases and sales within the six-month period can result in a theoretical profit. Professor Loss gives the following example:
In one case the defendant suffered a judgment of some $300,000 as a result of the application of the rule to various six-month periods from December 10, 1944, the date when he had first become a 10 percent owner, to December 3, 1947, when he had ceased to be such a holder, although his trading during those three years had resulted in an actual loss to him of over $400,000. Judge Learned Hand observed that this "crushing" liability "should certainly serve as a warning, and may prove a deterrent."
II L. Loss, Securities Regulation ch. 6C(f), 1063–64 (2d ed. 1961) (footnotes omitted).

which the defendant secured to enable it to finance the purchases to reduce the profit on the trades.

The profits contemplated by the statute are profits from the purchase and sale of the securities and not any costs such as bank charges, office overhead or collateral litigation which a party seeking control incurs. To permit the deductions claimed would be to encourage the type of transactions from which the statute squeezes all profit to be made on the basis of third party financing of the transactions which by itself would merely multiply the problems sought to be reached by Section 16(b).

*Id.*

In the instant case, the district court disallowed what has been characterized as "takeover expense deductions" and permitted TI to deduct only those expenses truly incidental to the transaction—brokerage commissions and transfer taxes.

*Conclusion*

This Court finds no valid justification for deviation from the express terms of section 16(b) or the case law interpreting it. The judgment of the district court is affirmed.

AFFIRMED.

GARZA, Circuit Judge, dissenting:

I respectfully dissent. The majority opinion is highly persuasive and its interpretation of *Kern County Land Co. v. Occidental Petroleum Corp.,* 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973) is certainly consistent with the "weight" of the law as it exists.

However, due to the particular facts of this case I would extend the rationale of *Kern County, supra.*

Section 16(b) provides that a statutory insider must surrender to the issuing corporation any profit realized from the purchase and sale of an equity security of the issuer within a period less than six months.

The statute itself states that it was enacted "for the purpose of preventing the unfair use of information which may have been obtained by [a statutory insider] . . . by reason of his relationship to the issuer." The statute itself is a strict liability statute designed to deter insiders from exploiting information not generally available to others in order to secure quick profits.

In *Kern County,* supra, the Supreme Court recognized that the nature of certain "unorthodox" transactions were such that a narrow exception to the otherwise strict liability rule was permissible. The facts of this case, I believe, would bring it within that narrow exception to the otherwise strict liability rule.

Texas International (TI) correctly argues that there are many similarities between the present case and that presented to the Supreme Court in *Kern County.* The putative "insider" in both cases was a party seeking to institute a "hostile" takeover of the issuer. It is evident from the record in this case that in both cases the party seeking takeover had no "inside information" upon which it could obtain short swing profits. In both cases the statutory stockholder failed in its attempt to take over the target company. The Supreme Court recognized in *Kern County* that after the merger agreement was approved, Occidental had no choice but to take action to protect its own interest.

In this case TI moved to protect its own interest when it agreed to sell its stock to the takeover company, Pan American World Airways, Inc. (Pan Am), after it became apparent that TI had lost the takeover battle. Unfortunately for TI, the sale took place forty-eight days before the statutory period had run.

Admittedly, the forced merger present in *Kern County* distinguishes that case from the present one. However, the facts of this case present a scenario which favors extension of the "unorthodox" exception.

Like Occidental, no one can argue that TI actually made use of inside information to obtain any short swing profits. The reason for the existence of § 16(b) is in no way promoted by its application to the present transaction. Furthermore, TI's sale of

stock was to the parent corporation for the purpose of protecting its own interests and cooperating in the merger transaction which Pan Am was attempting to effectuate.

The record clearly evidences that at the time of the sale by TI to Pan Am, no present or past shareholders of National Airlines had in any way been monetarily damaged by TI's purchase and sale of stock. In fact, it can be argued that the attempted takeover of National by TI helped to increase the value of National Airlines' stock. TI did not receive a higher price for the stock than any other shareholder. ALL shareholders of National Airlines received $50 per share.

Application of § 16(b) in this case serves only to permit Pan Am to avoid that portion of its contract with TI in which it agreed to pay $50 per share. The award in this case is nothing more than a "windfall" to Pan Am as the successor of National Airlines.

There is language in *Kern County* which, at first glance, as held by the majority opinion, appears to foreclose TI's present argument. At one point in that opinion the court stated:

> *Although traditional cash-for-stock transactions* that result in a purchase and sale or a sale and purchase within the six-month statutory period *are clearly within the purview of § 16(b),* the courts have wrestled with the question of inclusion or exclusion of certain "unorthodox" transactions.

TI's sale was clearly a "cash-for-stock" transaction; however, the situation before us, like *Kern County,* involved a hostile takeover which failed. The "hostile" takeover situation is hardly the "traditional cash-for-stock sale" which § 16(b) was designed to encompass. Rather, it is more of a "borderline" or "unorthodox" transaction and the above language can arguably be used to support such a finding.

The majority opinion cites the following language in *Kern County:*

> Occidental could, of course, have disposed of its shares of Old Kern for cash before the merger was closed. Such an act would have been a § 16(b) sale and would have left Occidental with a prima facie § 16(b) liability. It was not, therefore, a realistic alternative for Occidental....

in holding that this language forecloses TI's argument; however, it is unclear whether it would have made a difference to the Supreme Court if the disposition of shares had been to the takeover company or a third party.

I agree that if Occidental in *Kern County* or TI in this case had sold its shares after the merger agreement to a third party, § 16(b) would have been clearly implicated. On the other hand, such is not the case if the sale was to the takeover company itself and the statutory insider, TI, received no more than any other shareholder of the issuer. In the case before us, no potential for abuse would have arisen or could arise and it is unclear from the court's statement quoted above, if it was referring to a disposition of shares to a third party or to any party including the takeover company. My view is that the above language need not foreclose TI's argument. TI did what every other shareholder of National Airlines had to do and the fact that it did it forty-eight days before the six-month period expired should not work to the detriment of TI and as a windfall to Pan Am who bought the shares for the price stated in the merger agreement.

In summary then, I would hold that the "spirit" of *Kern County* suggests that in an "unorthodox" transaction as the one before us, where the policies of § 16(b) are in no way implemented (and in fact, where such rule permits a party to void an otherwise legal contract) liability against the statutory "insider" should not be enforced.

Under the facts of the case before us, the hostile takeover scenario is more closely analogous to the "unorthodox" transaction rather than the "traditional" cash-for-stock sale.

Under similar situations I would not make any distinction between a cash-for-stock and a stock-for-stock sale.

Accordingly, I would hold that § 16(b) was not applicable to TI and I would reverse the court below.