Richard **MORALES**, Plaintiff,

v.

**LUKENS, INC.** (As successor to the rights of General Steel Industries, Inc.), and Walco National Corporation, Defendants.

No. 82 Civ. 6652(DNE).

United States District Court, S.D. New York.

Sept. 24, 1984.

*Nader v. FCC,* 520 F.2d 182 (D.C.Cir.1975).

---

18. This proposed procedure would be submitted to the Court for its review and approval. See

David Lopez, Robert M. Cavallo and Lawrence Weiss, New York City, for plaintiff.

Butler, Jablow & Geller, New York City, for defendants; Stanley Geller and Donna Glasgow, New York City, of counsel.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDELSTEIN, District Judge:

Plaintiff Richard Morales is a shareholder of Lukens, Inc. ("Lukens") and brought this derivative action pursuant to Rule 23.1 of the Federal Rules of Civil Procedure[1] to recover shortswing profits owing to Lukens under Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b) (1982). The profits were allegedly made by defendant Walco National Corporation ("Walco") during an attempted takeover of General Steel Industries Inc. ("GSI"), which was eventually acquired by Lukens. Jurisdiction is conferred by Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa (1982). A trial was held and the parties have submitted post trial briefs and proposed findings of fact and conclusions of law.

## BACKGROUND

In January 1981, Walco began purchasing GSI common stock on the open market and acquired more than a 10% interest in GSI by April 22, 1981. From June 15, 1981 until December 15, 1981 (the six month short-swing profit period), Walco purchased 182,000 additional shares of GSI on the open market at a total cost of $2,842,190. In October 1981, Walco commenced a tender offer to purchase 750,000 shares of GSI at $19 per share. This offer was opposed by GSI which obtained a preliminary injunction halting the tender offer.

GSI then found a friendly bidder or "white knight," Lukens,[2] to acquire all of GSI's outstanding shares and thwart Walco's takeover attempt. On December 11, 1981, discussions between Lukens, Walco and GSI commenced concerning the acquisition of GSI by Lukens and the resolution of Walco's attempted takeover. The following day, attorneys for GSI and Walco negotiated a price of approximately $22,-000,000 for the purchase of all of Walco's GSI stock.[3] The terms of the final agreement provided that 396,000 shares would be sold to GSI for $7,524,000 ($19 per share) and 934,047 shares would be sold to Lukens for $14,944,752 ($16 per share). The agreement was made in anticipation of Lukens' complete acquisition of GSI.

To facilitate Lukens' acquisition of GSI, the agreement also provided that Walco was required to proceed with the tender offer for GSI shares at $19 per share. At the completion of the tender offer Walco was to resell these shares to GSI for $19 per share, the tender offer price. GSI was to place these shares in its treasury which would facilitate Lukens' acquisition of a

---

1. Plaintiff has satisfied the prerequisites for bringing a shareholder derivative action under Rule 23.1. Plaintiff is a security owner of Lukens, the successor by merger of GSI. A demand was made on the board of directors of Lukens by letter dated September 3, 1982. By letter dated September 23, 1982, counsel to the board of directors informed plaintiff's counsel that it had "concluded that there is no basis for Lukens to take ... action."

2. Stewart Holding Company, a subsidiary of Lukens was the named party in the transaction.

3. Walco owned 1,330,047 shares of GSI stock at the time of the agreement. 182,000 shares were purchased on the open market between June 15, 1981 and December 15, 1981 and 19,719 shares were received as a dividend on the stock purchased between June 15, 1981 and December 15, 1981 for a total of 201,719 shares subject to § 16(b) liability.

100% interest in GSI by reducing the number of GSI shares outstanding. The agreement stated that Walco would be paid $800,000 representing its expenses in carrying out the tender offer.

The parties recognized that § 16(b) liability would be incurred as a result of the transactions outlined in the agreement. Consequently, at the closing Walco paid GSI $565,000 which represented the § 16(b) liability calculated by the parties to the agreement.

Under the agreement, Lukens agreed to propose a cash merger to GSI shareholders by which Lukens would acquire all outstanding shares of GSI common stock at $16 per share.

The agreement was completed and signed on December 14, 1981 [hereinafter refered to as the "Agreement"].

On December 15, 1981, the closing took place for the sale of Walco's 1,330,047 shares for $22,468,752 paid by GSI and Lukens. On January 28, 1982, Lukens and GSI entered into an agreement and plan of merger in which Lukens would acquire all of the outstanding shares of GSI for $16 per share. On February 17, 1982, Walco's tender offer expired with 750,000 GSI shares having been tendered. These shares were turned over to a depositary who paid Walco $19 per share, the price paid by Walco for the shares when tendered. In March 1982, GSI was merged into Lukens.

## I. EVIDENTIARY ISSUES

A short trial was conducted where two witnesses testified, James M. Lynam, a vice-president of Walco and Arnold J. Jacobs, an attorney who represented Walco in connection with the Agreement. The bulk of the testimony of both witnesses consisted of descriptions of meetings and discussions held on December 11, 12 and 13 in connection with the Agreement. Plaintiff objected to this testimony at trial on grounds of hearsay and violation of the parol evidence rule. Testimony was heard over these objections and ruling was reserved. Both objections are denied.

The testimony concerned the negotiations between GSI, Lukens and Walco prior to reaching the Agreement. Such testimony is not hearsay. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence *to prove the truth of the matter asserted.*" Fed.R. Evid. 801 (emphasis added). Testimony of negotiations preceeding an agreement generally is not proffered for the truth of the statements made during negotiations, but rather for "the fact that the words as such were spoken." *N.L.R.B. v. Tex-Tan, Inc.,* 318 F.2d 472, 484 (5th Cir.1963); *accord Creaghe v. Iowa Home Mutual Casualty Co.,* 323 F.2d 981, 984 (10th Cir.1963); 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 801(c)[01], at 801–66 (1981). Defendants have not attempted to use the statements for the truth of the matters asserted, and the testimony therefore is not precluded under the hearsay rule.

The testimony is also not excluded under the parol evidence rule. The rule provides that "whenever contractual intent is sought to be ascertained from among several expressions of the parties, an earlier tentative expression will be rejected in favor of a later expression that is final." J. Calamari & J. Pearillo, Contracts § 3–2, at 99 (2d ed. 1977). The purpose of the rule is to provide a degree of assurance to the parties regarding the enforceability of the terms of a written contract. *See* C. McCormick, McCormick on Evidence § 210, at 427 (1954). This action does not involve the enforcement of the December 14, 1981 agreement, rather it involves the determination of civil liability under the securities laws for the transaction carried out pursuant to that agreement. The agreement itself is not being interpreted, it is merely one piece of evidence in determining liability. Therefore, the form of the agreement should not prevent a court from looking beyond the written words to determine liability under the federal securities laws. *See Reece Corp. v. Walco Nat'l Corp.,* 565 F.Supp. 158, 158–62 (S.D.N.Y.1981, on dam-

ages 1983); *Matas v. Siess,* 467 F.Supp. 217, 222–23 (S.D.N.Y.1979). Often the underlying agreement of the parties subjects the defendant to liability. *See Reece Corp.,* 565 F.Supp. at 158–62; *Matas,* 467 F.Supp. at 222–23. A court, however, must also look beyond the written agreement to determine if the underlying transactions would subject the parties to liability under the statute. The rule of law is the statute, not the contract. The objection to the testimony of the two witnesses at trial under the parol evidence rule is therefore denied.

## II. DETERMINATION OF SHORT SWING PROFIT

Plaintiff argues that the amount paid by Walco to GSI under the Agreement did not provide an accurate basis for calculating the short-swing profits actually earned by Walco. According to plaintiff, the short-swing profits should be determined using the highest price paid to Walco during the short swing period. That price is the $19 per share received by Walco for the block of 396,000 shares sold to GSI on December 15, 1981[4] as one part of the Agreement. Plaintiff further claims that the $800,000 paid to reimburse Walco for expenses incurred in completing the tender offer should be included in the sale price of the shares sold on December 15, 1981 and recovered as short-swing profit. Finally, plaintiff argues that cash dividends on the short-swing shares should be included in the short-swing profits. The dividends and reimbursed expenses were not included in the amount of 16(b) liability paid by Walco to GSI as part of the Agreement. Each of plaintiff's claims must be analyzed separately.[5]

### A. Determination of the Price to Compute Short Swing Profits

■ Plaintiff seeks to have the sales of stock to Lukens and GSI on December 15, 1981 and the transfer of stock on February 17, 1982 treated as three separate transactions. Then, according to plaintiff, the $19 sale price would be used to compute the short swing-profit because it is the highest price paid to the defendant during the short-swing period. The traditional rule for the computation of short swing profits is to match the highest price received with the lowest price paid for the 16(b) stock. *See Smolowe v. Delendo Corp.,* 136 F.2d 231, 237 (2d Cir.), *cert. denied,* 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943). The purpose of the rule is to "squeeze every penny of profit" from the defendant. *See Blau v. Lehman,* 286 F.2d 786, 791 (2d Cir.1960), *aff'd,* 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962).

■ The court finds that the $19 per share paid by GSI is not to be used to compute the short-swing profit because it is not the true sale price of the stock. The sales to GSI and Lukens, while treated as two separate parts of a larger transaction for bookkeeping and for appearance to the public, were in fact one transaction entered into between Walco and the GSI/Lukens forces. The sales took place at the same time and were both part of the overall plan to divest Walco of its interest in GSI and to facilitate the Lukens/GSI cash merger. Because the two prongs of the transaction were part of one transaction, the individual prices do not reflect the true sales price of the stock rather it is the average price received by Walco on the December 15, 1981 transaction. The uncontradicted testimony at trial demonstrates that the parties

---

**4.** The parties used a figure of $16,893, the per share price of all of the shares sold by Walco to both GSI and Lukens on December 15, 1981. ($22,468,752 divided by 1,330,047 shares).

**5.** As the facts of this case illustrate, the transaction entered into between the parties was by no means ordinary—a hostile takeover is a complex transaction. As noted by Judge Garza in his dissent in *Texas International Airlines v. National Airlines, Inc.,* 714 F.2d 533 at 542 (5th

Cir.1983) (Garza, J., dissenting), hostile takeovers may present a situation which warrants an extension of the "unorthodox transaction" exception. The defendants, however, did not argue that the transaction was an "unorthodox transaction" within the meaning of *Kern County Land Co. v. Occidental Petroleum Corp.,* 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973) so that the issue has not been addressed herein.

did negotiate in terms of one price for the entire block of GSI stock held by Walco and that Walco was not concerned with the breakdown of the payments. At the time of the negotiations, all the parties realized that Lukens, as the future merger partner with GSI, would eventually bear the full cost of the transaction regardless of which company's treasury bore the cost at the time of the sale. Given the facts established at trial regarding the nature of the negotiations and the underlying nature of the transaction, the average price received by Walco for all of the stock transferred on December 15, 1981 is the correct price to determine Walco's short-swing profit.

Alternatively, plaintiff suggests that the $19 per share received by Walco on February 17, 1982 for the shares it acquired under the tender offer should be used to compute the short-swing profit because this price is also the highest price received on the short-swing shares. Plaintiff alleges that the sale actually occurred on December 15, 1981 where defendant sold-short the 750,000 shares that Walco expected to purchase under the tender offer. This argument, however, is not persuasive. The December 15, 1981 transactions are distinct from the transfer of shares on February 17. The later transaction was part of the agreement between Walco and GSI to terminate Walco's hostile takeover bid of GSI. The acquisition and immediate sale of shares by Walco as provided for in the Agreement would thus not profit Walco directly.[6] In this context, Walco was act-

ing as the agent of GSI and Lukens. Short-swing profit liability has not been found where a 16(b) insider has managed a fund including stock in the insider's company, *see CBI Indust. v. Horton*, 682 F.2d 643, 646 (7th Cir.1982), or where an insider was a member of a partnership was not charged with the profit earned by the partnership, *see Blau v. Lehman*, 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962). In this case, the sale cannot be attributed to one who is merely acting as an agent.[7]

Therefore, the price used by the parties to compute § 16(b) liability in the Agreement was correct to determine the short-swing profits earned on the transaction.

## B. Liability for Dividends

The second issue facing the court is whether dividends on the short-swing shares should be included in the short swing profit. Walco received both cash and stock dividends during the relevant period. The settlement of 16(b) liability contained in the Agreement included the profit on the sale of stock received as part of stock dividends, but did not include the cash dividends.[8]

Courts in this circuit have generally concluded that cash dividends should not be considered as part of the profit recoverable under § 16(b). *See Blau v. Lamb*, 363 F.2d 507, 528 (2d Cir.1966), *cert. denied*, 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967); *Adler v. Klawans*, 267 F.2d 840, 849 (2d Cir.1959); *see also Cutler-Hammer, Inc. v. Leeds & Northrup Co.*, 469

---

6. The transaction would only facilitate an agreement whereby Walco was able to sell the stock that it had previously purchased to GSI and Lukens. Value may have conferred on Walco for carrying out this transaction but any value was incorporated in the price of the stock sold on December 15, 1981. The profit on some of that stock was subject to 16(b) and Walco disgorged the profit on these shares. The tender offer did benefit GSI and Lukens who were able to consummate their merger with fewer shares outstanding.

7. Defendant alleges that Walco was no longer subject to § 16(b) at the time of the February 17, 1982 transaction because it no longer held 10% of GSI's outstanding stock. Plaintiff alleges that the sale took place on December 14, 1981

as part of the Agreement when Walco was a 16(b) insider. In holding that Walco was acting as GSI and Lukens' agent, the court need not reach the question of whether any profit was earned on the February 17, 1982 sale.

8. A stock dividend in and of itself would not create a profit and would therefore not be recoverable under § 16(b). A stock dividend merely cuts the corporate pie into a larger number of smaller slices with the proportionate ownership remaining unchanged. No transfer of value has actually taken place between the corporation and its shareholders. Profit, however, may be realized upon the sale of these short swing dividend shares if sold at a profit during the six month short-swing period. This profit would be recoverable under § 16(b).

F.Supp. 1021, 1024 (E.D.Wis.1979); *Allis-Chalmers Mfg. Co. v. Gulf & Western Indus.*, 372 F.Supp. 570, 588–89 (N.D.Ill. 1974), *modified*, 527 F.2d 335 (7th Cir. 1975), *cert. denied*, 423 U.S. 1078, 96 S.Ct. 865, 47 L.Ed.2d 89 (1976). Absent evidence that the 16(b) insider manipulated the dividend, there is no basis to require defendant Walco to disgorge the cash dividend. *See Marquette Cement Mfg. Co. v. Andreas*, 239 F.Supp. 962, 968 (S.D.N.Y.1965). There is no evidence of any manipulation by Walco of the dividends paid by GSI during the relevant period. First, the cash dividends paid during the relevant period are consistent with those previously paid by GSI. Further, given the hostile relationship between GSI and Walco prior to the Agreement as evidenced by GSI's attempt to halt the Walco tender offer, it is extremely unlikely that Walco could have exerted any influence over the GSI dividend decision.

Therefore, the cash dividends are properly excludable from the computation of 16(b) liability.

C. Liability for "Reimbursed Expenses"

█ The next issue is whether the $800,000 payment by GSI to Walco for the stated purpose of reimbursing Walco for expenses incurred in connection with the tender offer should be included in computing short-swing profits. The usual case involves the attempt to deduct the expenses from short-swing profit, here, however, defendant seeks to exclude a payment intended to reimburse him for these same type of expenses. The rationale for allowing the deduction or exclusion are the same.

The expenses incurred in an unsuccessful tender offer where the shares purchased by the unsuccessful bidder are subsequently sold to the successful bidder have been held to be non-deductible expenses in computing profit under 16(b). *See Texas Int'l*

Airlines v. National Airlines, 714 F.2d 533 at 541 (5th Cir.1983); *Lane Bryant, Inc. v. Hatleigh*, 517 F.Supp. 1196, 1202 (S.D.N.Y.1981). The situation presented in *Texas International* was different from the circumstances here. In that case, the expenses sought to be deducted from 16(b) liability were incurred by the unsuccessful bidder in the course of a tender offer in which they expected to benefit. The same is true of the transaction in *Lane Bryant* where the 16(b) insider was at all times acting for his own benefit. Here, Walco had already negotiated and had agreed to terminate its pursuit of GSI. The tender offer, when recommenced following the agreement was done as an agent in behalf of and for the benefit of GSI and Lukens. The $800,000 thus cannot be recovered by plaintiff because it was not profit. The payment was merely the reimbursement by a principle of the expenses incurred by his agent in the course of carrying out his duty under the agency agreement.

In contrast to post-Agreement expenses, expenses incurred prior to the Agreement and reimbursed by GSI would have benefited Walco at the time they were incurred and would need to be included in the sales price of the stock and would be subject to § 16(b) liability. The stipulated facts contain a list of expenses incurred as a result of the tender offer and the date that the expenses were incurred. More than $800,000 was spent by Walco in connection with the tender offer following the December 14, 1981 agreement. Therefore, the $800,000 payment reflects the expenses incurred for the benefit of Lukens and GSI and is not subject to § 16(b) liability.[9]

There is a limit on the funds that may be reimbursed lest the unsuccessful suitor in a tender offer attempt to funnel his 16(b) profit into these reimbursement payments.[10] In this case, the $800,000 payment was stipulated by the parties to accurately reflect the costs incurred by Walco

---

**9.** Plaintiff did not raise and this court has not addressed whether the $800,000 payment should be prorated between the expenses incurred prior to the agreement and those incurred after the Agreement. The Agreement states that the payment was for expenses incurred after the Agree-

ment. There was no evidence presented to contradict the terms of the Agreement.

**10.** In any event, it would appear to be a rare situation where an unsuccessful suitor would

in carrying out the tender offer for Lukens and GSI. If there had been an attempt to shift part of the sales price to these other expenses, this court would not hesitate to include the entire amount in 16(b) profits because the bad faith would militate against a segregation of the funds.

## CONCLUSION

The court finds that the payments made by Walco as provided for in the December 14, 1981 agreement entered into between Walco, Lukens and GSI accurately represented the short-swing profits earned by Walco on the sale of GSI stock to Lukens and GSI. No additional short-swing profit liability on the part of Walco has been found.

Final judgement shall be entered for defendants and this case dismissed. Each party shall bear its own costs.

The foregoing shall constitute the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

SO ORDERED.

See also, D.C., 99 F.R.D. 130.

David L. Rose, Kerri Weisel, Melissa Page Marshall, Attys., Civ. Rights Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff, U.S.

become an agent for the target company and     benefit under this ruling.