SYNALLOY CORPORATION, Plaintiff,

v.

Richard E. GRAY, Chariot Holdings, Ltd., Chariot Plastics, Inc., and The Chariot Group, Inc., Defendants.

The CHARIOT GROUP, INC., Counterclaimant,

v.

SYNALLOY CORPORATION, James G. Lane, Jr., Richard E. Ingram, C.D. Vinson, Sibyl N. Fishburn and Glenn R. Oxner, Counterclaim Defendants.

Civ. A. No. 91–305 MMS.

United States District Court, D. Delaware.

March 22, 1993.

See also 142 F.R.D. 266.

Edmond D. Johnson, and Alan J. Stone, Law Firm of Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for plaintiff and counterclaim defendants.

Henry A. Heiman, Heiman, Aber & Golslust, Wilmington, DE, for defendants and counterclaimant.

## OPINION

MURRAY M. SCHWARTZ, Senior District Judge. .

Plaintiff, Synalloy Corporation, ("Synalloy"), a Delaware corporation with its principal place of business in Spartanburg, South Carolina, seeks summary judgment on its complaint and on the amended counterclaim filed by the defendants, Richard E. Gray, Chariot Holdings, Ltd., Chariot Plastics, Inc. and the Chariot Group, Inc. Docket Item (D.I.) 41. All of the corporate defendants are Delaware corporations with principal places of business in New York. The complaint alleges defendants violated Section 16(b) of the Securities Exchange Act of 1934, and the amended counterclaim alleges plaintiff violated Section 10(b) of the same act and Rule 10b–5. D.I. 1, 25; 15 U.S.C. §§ 78j(b), 78p(b) (1988); 17 C.F.R. § 240.10b–5 (1992). Jurisdiction for both the complaint and counterclaim arises under 15 U.S.C. § 78aa (1988). For the reasons which follow, plaintiff's motion will be granted in part and denied in part.

### I.

While each of the defendants beneficially owned more than 10% of the plaintiff's outstanding shares of common stock, D.I. 48 at 137–141, a web of ownership bound the defendants together. In the center is Richard Gray who owns 100% of Chariot Holdings. D.I. 43 at 14. According to Mr. Gray, Chariot Holdings, in turn, "indirectly or directly" owns the stock of Chariot Plastics. D.I. 43 at 14. Finally, Chariot Plastics owns 75 to 80% of Chariot Group's stock. D.I. 43 at 15.

### A. The Initial Transactions

The events leading up to the transactions at issue began in January 1989 when Chariot Group exercised an option to purchase approximately 20% of plaintiff's stock. D.I. 48 at 175A; D.I. 43 at 77–78. James G. Lane,

Jr., the Chairman of the Board and Chief Executive Officer of Synalloy, stated in deposition that previously the corporation had "voluntarily" let Mr. Gray name two directors of the corporation's nine directors. D.I. 43 at 80. Subsequent to Chariot's latest purchase, Mr. Gray gained the right to name an additional director. D.I. 43 at 80. Shortly thereafter, the transactions at issue began to occur.[1]

On October 9 and 10, 1990, Chariot Holdings Ltd. purchased 8,000 shares of Synalloy common stock on the open market at prices ranging from $5.75 to $6.00 per share. D.I. 43 at 187; D.I. 48 at 130–131.[2] On November 29, 1990, Chariot Group purchased an additional 9,000 shares at $7.00 a share and another 1,000 shares at $6.625 a share. *Id.*

**B. The Repurchase Agreement**

Sometime during the period when the 18,000 or more shares were purchased by Chariot Holdings and Chariot Group, Mr. Lane and Mr. Gray commenced negotiations to allow Synalloy to buy back a portion of its outstanding stock and to resolve certain outstanding litigation.[3] Originally, in November 1990, Synalloy had planned to buy back $1 million of common stock on the open market, with the condition that Mr. Gray place some amount of his shares in a non-voting trust. D.I. 43 at 87–88. This deal, however, proved unworkable. *Id.* In February, 1991, discussions were initiated for a different arrangement whereby Mr. Gray would sell shares directly to Synalloy. D.I. 43 at 87.

As a starting point, a sale of 400,000 shares at $9.50, a price slightly below market price, was discussed. D.I. 43 at 89–90; D.I. 48 at 178. Between the initial conversations in early February and the final execution of a "Repurchase Agreement" on March 4, 1991, negotiations continued which eventually brought the number of shares involved down to 350,000 and the price up to $10.00 per share, a figure still below market price. D.I. 43 at 219.

As part of the negotiations concerning price and quantity, Mr. Gray felt that an additional "side agreement" should be worked out to compensate for the sale below market price. D.I. 43 at 92. Describing these negotiations, Mr. Lane stated, "we would pay him [the difference between the sale price and market price] through settling our outstanding lawsuits . . . he felt that [the difference] would be a legitimate price to pay for settling those lawsuits. I indicated that in . . . no event would I do that, that I simply would not be comfortable with such an agreement." D.I. 43 at 93. While Mr. Lane apparently would not settle the lawsuits for a price, he "agreed that the settlement of those lawsuits was essential in the purchase of shares from [Gray]." D.I. 43 at 95.

The actual drafting of the Repurchase Agreement was left to the parties' lawyers and they set to work on a draft on March 1, 1991. D.I. 43 at 141, 227. Initially, the Settlement Provision of the Repurchase Agreement as proposed by Synalloy's counsel stated: "The parties agree to settle all disputes and litigation presently pending between the parties and their affiliates, directors and officers. . . ." D.I. 43 at 231. Mr. Gray's counsel telecopied back a draft, which, with more expansive language inserted by hand, read: "The parties agree to execute and deliver mutual releases covering any and all claims through the date hereof and shall settle all disputes and litigation presently pending between the parties and their affiliates, directors and officers. . . ." D.I. 43 at 238 (insertion underlined).

---

1. At all pertinent times, the stock at issue, Synalloy's common stock traded on the American Stock Exchange. *See, e.g.,* D.I. 43 at 109.

2. A letter from Latham & Watkins and Amendment No. 19 to a Schedule 13D, filed on November 29, 1990, indicate that on October 9, 1990, 2,500 shares were purchased for $5.875, 4,000 shares were purchased for $6.00, 500 shares were purchased for $5.75 and on October 10, 1990, 1,000 shares were purchased for $6.00. D.I. 43 at 187; D.I. 48 at 37D.

3. The parties were involved in two lawsuits *Synalloy Corporation v. Richard E. Gray v. Joseph J. Blake, Jr., et al.,* C.A. No. 10703, Court of Chancery of the State of Delaware, New Castle County, and *Chariot Holdings, Ltd. v. Synalloy Corporation, et al. v. Chariot Holdings, Ltd. and the Chariot Group, Inc. et al.,* C.A. No. 89–168, United States District Court for the District of Delaware. D.I. 43 at 223–224; D.I. 48 at 75–76.

Attempting to breach an impasse over the Settlement Provision over the weekend, Mr. Gray and Mr. Lane conferred on March 2, 1991, before the attorneys resumed drafting on March 3. The issue of whether the Settlement Provision would contain a broad, general release or a more narrow release remained a difficulty. Mr. Lane explained at deposition,

> A: Richard was very, very persistent in wanting us to put a provision in the contract that would provide that each party waive any rights that they might have against the other party up through the execution of the agreement. And after talking about this repeatedly and for some time, I finally told Richard that his persistence lead [sic] me to think he might know of some right we had the [sic] I didn't know about and asked him if there was something he should be telling me.
>
> Q: What did he say?
>
> A: And Richard said "Oh no. I just felt like that we—it was in the interest of the company that we bury the hatchet and go forward in a cooperative manner for the benefit of the shareholders." And I said "Well, Richard, I certainly think we should go forward in the interest of the shareholders, but I am never going to waive a right that I don't specifically know what I am waiving. I might have a billion dollar claim against somebody and wouldn't know about it. So how could I waive rights that I don't specifically evaluate?" So basically, then I felt that we had discussed it at some length and I told Richard that unfortunately this was not anything that we were going to change our minds on, that it was not negotiable. Richard said "Well, it's not quote 'a deal breaker.'"

D.I. 43 at 127–128. Asked about this conversation at his deposition, Mr. Gray could not recall specifically what was said. D.I. 43 at 50.

Asked if the refusal to agree to a general release was a "deal breaker", Mr. Gray responded:

> I don't remember using the words deal breaker. I said it was important to us if we were going to work together, I pointed out that you can't bury the hatchet at the same time you're not burying the hatchet. You either buried it or you didn't. I said that was important, that we were burying the hatchet, that we agreed we were burying the hatchet.

D.I. 48 at 193. Recalling the conversations with Mr. Lane, Mr. Gray said he had explained his position by stating, "we either release each other or we don't, we either go to war or we go to peace, you either bury the hatchet or don't bury the hatchet, and as I said before, that's the basis on which I am prepared to proceed." D.I. 48 at 196. More directly, Gray testified that at one point he told Lane, "we have to resolve all of the outstanding litigations, all of the claims we have or might have against each other." D.I. 48 at 190.

Regardless of the course of negotiations, the parties buried the hatchet long enough to execute the final Repurchase Agreement on March 4, 1991. The final Settlement Provisions stated:

> *Settlement.* The parties agree to execute mutual releases and settle all disputes and litigation presently pending between the parties and their affiliates, directors and officers, including, without limitation, the following:
>
> (i) *Synalloy Corporation v. Richard E. Gray v. Joseph J. Blake, Jr., et al.,* C.A. No. 10703, Court of Chancery of the State of Delaware, New Castle County; and
>
> (ii) *Chariot Holdings, Ltd. v. Synalloy Corporation, et al. v. Chariot Holdings, Ltd. and the Chariot Group, Inc. et al.,* C.A. No. 89–168, United States District Court for the District of Delaware.
>
> In addition, except as required by law, neither party nor their affiliates shall make, or assist any third party in making, any claim against the other party or any of its affiliates which arises out of the purchase and sale contemplated in paragraph 1 above.

D.I. 43 at 223–224; D.I. 48 at 75–76.

## C. The Later Transactions

Meanwhile, back on the stock exchange, four months after the purchases on October 9

and 10, 1990, three months after the November purchases, and concurrent with the Repurchase Agreement negotiations, Chariot Group sold 56,000 shares of common stock on February 27 and 28, 1991. Amendment No. 21 to the Schedule 13D, filed on March 5, 1991, breaks the 56,000 share sale down as follows:

February 27: 13,100 shares at $12.7500
11,900 shares at $12.8750
5,000 shares at $13.0000
February 28: 16,500 shares at $13.0000
6,000 shares at $13.1250
1,600 shares at $13.5000
900 shares at $13.6250
700 shares at $13.7500
300 shares at $13.8750

D.I. 43 at 199. Not surprisingly, this activity did not go unnoticed. Through Mr. Joe Kaufman, a specialist for Synalloy stock on the American Stock Exchange, or other sources, Mr. Lane and Ms. Cheryl Carter, Synalloy's Corporate Secretary, learned that a large part of the unusually high volume of trades were sales by the investment firm of Goldman Sachs. D.I. 43 at 110–11. Mr. Lane and Ms. Carter did not know if the shares being sold by Goldman Sachs were from the firm's own accounts or customers' accounts, but they did believe that some of Mr. Gray's shares were held by Goldman Sachs. D.I. 43 at 111.

On March 5, 1991, the day after the Repurchase Agreement had been executed, Gray and Chariot filed Amendment No. 21 to their Schedule 13D which notified Synalloy of the February trades and served to disinter the hatchet. D.I. 43 at 190, 257. In response, Synalloy wrote to Mr. Gray on March 14, 1991, to request payment of any profits due to the corporation under section 16(b) of the Securities and Exchange Act of 1934. *Id.* On March 28, 1991, Mr. Barry J. Quinn, Vice President and General Counsel of the Chariot Group, Inc., responded to Synalloy's letter by stating, in part, that the Settlement Provision of the Repurchase Agreement precluded Synalloy from making a demand under section 16(b). D.I. 43 at 259–261. Synalloy filed a complaint in this Court on May 24, 1991, to recover the profits made by the defendants in the February trades, D.I. 1, and defendants filed a counterclaim, which has been amended. D.I. 25.

## II.

Rule 56 of the Federal Rules of Civil Procedure requires the Court to enter summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

On such disputes, the non-moving party must have placed in the record sufficient evidence for the Court to find a genuine issue of material fact.

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case; and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

It is not enough for the non-moving party to have provided a scintilla of evidence supporting its position. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 252, 106 S.Ct. at 2512. The Court will enter summary judgment if "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552.

It is not the Court's task to replace the trier of fact and to resolve questions about which genuine factual issues exist. The Court will only enter summary judgment if no rational trier of fact could weigh the evi-

dence and find for the nonmoving party. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510.

## III.

Plaintiff's complaint seeks to recoup profits under section 16(b) of the Securities and Exchange Act which allows a corporation to recover any profit made by a statutory insider on the purchase or sale of the corporation's stock within a six month period. 15 U.S.C. § 78p(b). Defendants, in response to the plaintiff's motion for summary judgment, have stated, "For purposes of this motion, defendants do not dispute that, absent a settlement agreement, the short swing market trades would have been subject to Section 16(b) liability." D.I. 47 at 19 n. 10.[4]

In light of defendants' concession, the Court, *sua sponte*, raised the issue of under what circumstances a corporation may effectively release, waive or settle otherwise cognizable claims under section 16(b). On the facts set forth on the summary judgment record, Synalloy could not effectively release the defendants from § 16(b) liability. As a consequence, the defendants are liable for damages in the amount of the short swing profits.

### A. Release of Section 16(b) Liability

Section 16(b) of the Securities and Exchange Act of 1934 states, in part,

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months ... *shall inure to and be recoverable by the issuer*, irrespective of any intention on the part of such beneficial owner, director, or officer. ...

15 U.S.C. § 78p(b) (emphasis added). Considering their concession, the defendants have a statutory obligation to pay any profits gained on the short swing sales to plaintiff. As a defense, the defendants point only to the Settlement Provision of the Repurchase Agreement and argue that this provision "settled all disputes that existed, or might exist, between all parties to the Repurchase Agreement and any of their affiliates." D.I. 47 at 20.

Difficulty arises with the Settlement Provision's application to the short swing trades, however, because of Section 29(a) of the 1934 Act. Section 29(a) states,

> Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby *shall be void.*

15 U.S.C. § 78cc(a) (emphasis added). This section "prohibits waiver of the substantive obligations imposed by the Exchange Act." *Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 228, 107 S.Ct. 2332, 2338, 96 L.Ed.2d 185 (1987).

As one court has explained in considering an attempt by a corporation and an insider to waive § 16(b) liability,

> In order to protect minority shareholders and the public, Section 16(b) aims to prevent the unfair use of information by insiders. The statute was designed to eliminate the widespread abuses by corporate fiduciaries that had been uncovered by the stock market investigation.
>
> Section 16(b) is a remedial statute. It should be liberally construed to accomplish its purpose. The courts have interpreted it in "the broadest possible" terms, with all doubts and ambiguities resolved against corporate insiders.
>
> .    .    .    .    .
>
> That the insider may have intended to benefit the corporation or may have acted at the corporation's behest does not create immunity against Section 16(b) liability.
>
> .    .    .    .    .

---

4. Defendants do dispute the amount of liability under section 16(b). D.I. 47 at 19 n. 10.

The disintegrating erosion by judicially created exceptions would undermine the efficacy of Section 16(b). Only by an attitude of "uncompromising rigidity", analogous to that applicable to insider trading by a fiduciary, can the courts maintain the prophylactic standard of behavior imposed by this statute.

*Volk v. Zlotoff*, 285 F.Supp. 650, 654–56 (S.D.N.Y.1968) (citations and footnotes omitted). *Cf. Tyco Laboratories, Inc. v. Cutler–Hammer, Inc.*, 490 F.Supp. 1, 8 (S.D.N.Y. 1980) (finding it "well settled" that equitable estoppel defense is insufficient as a matter of law under § 16(b) in the Second Circuit). As other courts have made clear, in § 29(a) Congress provided a vehicle for insuring the "prophylactic standard" is maintained. Referring to § 16(b), one court has stated, "The statute seeks to protect stockholders from the acts of corporate insiders.... It is in manifestation of this purpose that § 29(a) of the Act explicitly prohibits any attempt to alter or waive requirements of the Act even by the express agreement of the parties." *Perfect Photo, Inc. v. Grabb*, 205 F.Supp. 569, 572 (E.D.Pa.1962). *See Jefferson Lake Sulphur Co. v. Walet*, 104 F.Supp. 20, 23–24 (E.D.La.1952), *aff'd*, 202 F.2d 433 (5th Cir.), *cert. denied*, 346 U.S. 820, 74 S.Ct. 35, 98 L.Ed. 346 (1953) (under Section 29(a), a corporation will be estopped from pursuing section 16(b) claims by neither express nor implied waiver).

Courts have even refused to consider any benefit which may have resulted to the corporation in waiving compliance with § 16(b). As one court explained,

A corporation is prohibited by Section 29(a) of the Securities Exchange Act of 1934 from waiving compliance with any of the provisions of the Act, including Section 16(b).... Courts have held that no matter what the resulting "benefit" to the corporation, defenses to actions asserted under Section 16(b) based on waiver, release or estoppel, are insufficient as a matter of law.

*Allied Artists Pictures Corp. v. Giroux*, 312 F.Supp. 450, 451 (S.D.N.Y.1970) (citations omitted). *See also Kay v. Scientex Corp.*, 719 F.2d 1009, 1014 (9th Cir.1983) (while not reaching the issue, noting with approval that district courts have held corporations may not waive right to recover under section 16(b)); *Schur v. Salzman*, 365 F.Supp. 725, 733 (S.D.N.Y.1973) (corporation not estopped from recovering under § 16(b) notwithstanding participation in and benefit from defendant's sale).

The Court need not determine whether a corporation may ever release or waive § 16(b) liability. Without any competing consideration, there is a serious question as to whether Synalloy could effectively waive § 16(b) liability because it had knowledge of the transactions. However, the Court need not go so far because the only conclusion which can be gleaned from the summary judgment record is the corporation had no knowledge of the trades for which § 16(b) liability has attached.

Mr. Lane, the Chairman of the Board and Chief Executive Officer of Synalloy, explained during his deposition:

Q: Now, there came a time after the agreement was signed on March 4th when you learned that Mr. Gray, or companies which he headed up—Charity Group, Charity Holdings, for example—that some or all of them had sold shares of Synalloy during the last week in February; is that correct?

A: That is correct.

Q: And how did you learn about that?

A: We learned about that from, I believe it is called, a 13–D filing. And I don't recall whether we learned about it from perhaps a news release of some news that came up on the wire services about the 13–D filing. But the source of information was the 13–D filing with the S.E.C.

D.I. 43 at 132. Joseph J. Blake, general counsel for Synalloy, stated in his affidavit that "I first learned of [the February sales] when I received Chariot's Schedule 13D forms during the week of March 4, 1991. As far as I am aware, no one else at Synalloy learned of these sales prior to the filing of Chariot's Schedule 13D form." D.I. 43 at 11; D.I. 48 at 235. Mr. Gray himself, when asked if he told Mr. Lane about the Febru-

ary transactions replied, "I don't recall whether I told him directly, but—well, I do recall that I never voluntarily said to him directly we did this, but there were discussions we had which led me to believe that he knew certain things, when I told him certain things that should lead him to believe that maybe we had...." D.I. 43 at 45.

To show the corporation had knowledge and, defendants argue, could validly release the claims, the defendant points to the portion of Mr. Blake's affidavit in which he states, "Mr. Lane told me that he suspected that Chariot was selling shares in the open market." D.I. 41 at 8; D.I. 48 at 232. Mr. Lane's own deposition testimony makes it clear that he at least had suspicions that defendants were unloading stock they held at Goldman Sachs. *See, e.g.,* D.I. 48 at 216. Mere generalized suspicion hardly equates with the specific knowledge which defendants argue would suffice to release § 16(b) liability.

In light of the language of Section 29(a), and the case law which has developed under it, the Court finds that the evidence in the record will not support a finding that the section 16(b) obligations of the defendants were released in the March 5, 1991, Repurchase Agreement. Defendants have only provided the Court with evidence to show that the plaintiff suspected some of the trades on February 27 and 28 were in the defendants' stock. In addition, the defendant primarily responsible for the negotiations has admitted he did not volunteer the information crucial to allowing plaintiff to release the liability knowingly. With only mere suspicion of the outstanding liability, the corporation could not, as a matter of law, have released the defendants from that liability. For this reason, summary judgment will be granted to plaintiff on the issue of § 16(b) liability.

## B.  Damages Under Section 16(b)

Section 16(b) requires that "any profit realized by [a qualifying defendant] from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months ... shall inure to and

be recoverable by the issuer...." 15 U.S.C. § 78p(b). *See also Reliance Electric Co. v. Emerson Electric Co.,* 404 U.S. 418, 419, 92 S.Ct. 596, 597, 30 L.Ed.2d 575 (1972) ("a corporation may recover for itself the profits realized by an owner of more than 10% of its shares from a purchase and sale of its stock within any six-month period, provided that the owner held more than 10% 'both at the time of the purchase and sale.' " (footnote omitted)). The Court having held the Settlement Agreement cannot be successfully employed as a defense, and the defendants having conceded liability under section 16(b), the only remaining dispute is the amount of damages.

The parties have questioned which corporation's shares go into the calculation since only Chariot Group sold shares in February, while both Chariot Group and Chariot Holdings bought in October. The defendants maintain that the 8,000 shares bought by Chariot Holdings in October may not be matched with the shares sold by Chariot Group in February because "Holdings does not have beneficial ownership of shares owned or sold by Group." D.I. 48 at 94.

The Court of Appeals for the Second Circuit has stated, "A company may be the beneficial owner of stock in a variety of ways, including through its absolute control over a subsidiary that owns the stock." *Mayer v. Chesapeake Ins. Co.,* 877 F.2d 1154, 1158 (2d Cir.1989), *cert. denied,* 493 U.S. 1021, 110 S.Ct. 722, 107 L.Ed.2d 741 (1990). As an example, the Court of Appeals relied upon *Blau v. Mission Corp.,* 212 F.2d 77, 80 (2d Cir.), *cert. denied,* 347 U.S. 1016, 74 S.Ct. 872, 98 L.Ed. 1138 (1954), in which one corporation was found to have "absolute control" of another corporation and therefore beneficial ownership because of the former's ownership of 60% of the latter's stock. While the issue in both of these cases from the Second Circuit was defining insider status under section 16(b), the same analysis should apply to when one corporation's sales or purchases should be matched with another's. *See Kern County Land Co. v. Occidental Petroleum Corp.,* 411 U.S. 582, 594, 93 S.Ct. 1736, 1744, 36 L.Ed.2d 503 (1973) ("In deciding whether borderline transactions are within the reach

of the statute, the courts have come to inquire whether the transaction may serve as a vehicle for the evil which Congress sought to prevent. . . .").

■ To allow an insider to escape section 16(b) liability because certain transactions were performed by another corporation over which the first corporation exercised control would allow 16(b) liability to evaporate. Every time an insider bought for his own account and then sold from the account of a controlled corporation, the insider could trade on inside information and escape liability nevertheless. This threat is especially pertinent when the ownership overlaps as substantially as it does here. For these reasons, the Court finds that 8,000 shares sold by Chariot Group are attributable to Chariot Holdings because of its control over Chariot Group and those 8,000 shares will be used in calculating damages.

■ In the calculation of damages, the United States Court of Appeals for the Second Circuit has explained,

> "To effectuate the remedial purposes of § 16(b), courts should compute the amount of profit from short-swing sales in a manner that will maximize the plaintiff's recovery. Where there are multiple purchases and multiple sales, and hence some uncertainty as to profit or loss with respect to the short-swing shares, the § 16(b) profits are to be calculated by matching the 'lowest price in [with the] highest price out.'"

*Mayer v. Chesapeake Ins. Co. Ltd.*, 877 F.2d at 1164 (quoting *Smolowe v. Delendo Corp.*, 136 F.2d 231, 239 (2d Cir.), *cert. denied*, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943)) (citation omitted). In this action, plaintiff seeks damages for 18,000 shares of its common stock bought and sold by the defendants within a six month period. As to the 18,000 shares for which liability has been established, the Court finds that the defendants paid $119,326.43 for the Synalloy common stock in the October and November.[5] In order to "maximize the plaintiff's recovery", the Court looks to the highest prices for which 18,000 shares were sold in February. Using the final five transactions of February 28 which involved 9,500 shares at prices between $13.875 and $13.125, and 8,500 shares from the first transaction of February 28, all of which sold at $13.00 per share, the Court finds the defendants realized $236,900 on the sale of 18,000 shares of Synalloy's common stock.[6] The amount of damages for the 18,000 shares is the difference between these totals, $117,573.57.

## C. Prejudgment Interest

■ "Although § 16 says nothing about the recovery of prejudgment interest one way or the other, prejudgment interest is generally considered a part of § 16(b) recovery." *Whittaker v. Whittaker Corp.*, 639 F.2d 516, 533 (9th Cir.), *cert. denied*, 454 U.S. 1031, 102 S.Ct. 566, 70 L.Ed.2d 473 (1981). The discretion should be exercised "in response to considerations of fairness." *Board of County Comrs. v. United States*, 308 U.S. 343, 352, 60 S.Ct. 285, 289, 84 L.Ed. 313 (1939), *quoted in Blau v. Lehman*, 368 U.S. 403, 414, 82 S.Ct. 451, 457, 7 L.Ed.2d 403 (1962). In determining the fairness of allowing interest, courts have considered whether the insider acted knowingly or in bad faith, the position of the insider within the corporation, and the insider's willingness to pay promptly. *See Whittaker*, 639 F.2d at 533–34 (citing cases). In the exercise of its discretion, the Court holds that interest from the

---

**5.** This sum is taken from 1,000 shares purchased at $6.625, 9,000 shares at $7.00, 1,000 shares at $6.00, 500 shares at $5.75, 4,000 shares at $6.00, 2,500 shares at $5.875 for a total of 18,000 shares purchased for $117,187.50, plus commissions. Commissions are included in the purchase price in order to deduct them from damages because they are not recoverable by the corporation. *See, e.g., Texas International Airlines v. National Airlines, Inc.*, 714 F.2d 533, 542 (5th Cir.1983), *cert. denied*, 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 721 (1984) (affirming exclusion from damages under § 16(b) the "expenses truly incidental to the transaction—brokerage commissions and transfer taxes"); *Reece Corp. v. Walco National Corp.*, 565 F.Supp. 158, 166 (S.D.N.Y.1981) (allowing deduction from § 16(b) damages for brokerage commission, but disallowing legal expenses).

**6.** The highest priced transactions of February 28 involved 8,500 shares at $13.00, 6,000 shares at $13.125, 1,600 shares at $13.50, 900 shares at $13.625, 700 shares at $13.75, and 300 shares at $13.8750 for a total of 18,000 shares sold for $236,900.

date on which the transactions were completed, February 28, 1991, will be awarded to plaintiff. The Court awards interest in light of the following considerations.

First, Gray repeatedly attempted to obtain a general release which he obviously thought would obviate short swing profit liability. Gray had every opportunity to disclose the offending sales, but failed to do so. Having admitted short swing profit liability, he has relied on the Release Provision of the Repurchase Agreement, even though he knew he had concealed the information about the short swing sales.

Second, when confronted with his wrongdoing, he did not rectify the wrong after receiving plaintiff's March 14, 1991, letter demanding disgorgement of the § 16(b) short swing profits, necessitating the filing of this suit within two months of the denial of the demand. The lack of candor before the execution of the Repurchase Agreement was only compounded by the defendants reluctance to acknowledge § 16(b) liability afterwards. The letter sent to plaintiff in response to plaintiff's demand for § 16(b) damages asserted that the damages had been settled in the March 4, 1991, Repurchase Agreement. D.I. 43 at 259–61. In light of Mr. Gray's admission that he had never told plaintiff about the February sales, but expected it to know, the Court finds the letter reflects defendants' continuing display of obstructive behavior and questionable faith.

Finally, the Court finds an award of interest appropriate because an alternative result would be inconsistent with the statute's remedial purpose. For the Court not to allow the recovery of interest would enable the defendants to enjoy the benefit of their wrongdoing. The concern here is not for the benefit arising from the sales, for which the statute mandates recovery, but is for the fact that defendants would reap a benefit simply by having the use of the short swing profits until such time as a court should order judgment. Such a result would not serve the statute's remedial purpose where, as here, there is overwhelming indication that defendants knew exactly what they were doing. In that circumstance, they should not be permitted any opportunity to gain from their

unlawful act. For these reasons, the Court will order prejudgment interest paid to the plaintiff as requested in the complaint.

### D.  The Counterclaim

In their amended counterclaim, defendants allege "plaintiff violated Section 10(b) of the 1934 Act and Rule 10b–5 adopted thereunder." D.I. 25 at ¶ 11. In the Third Circuit, the elements of § 10(b) and Rule 10b–5 claims which a private plaintiff must plead are:

> (1) a false representation of (2) a material (3) fact, (4) the defendant's knowledge of its falsity and his intention that the plaintiff rely on it, (5) the plaintiff's reasonable reliance on the representation, and (6) the plaintiff's resulting loss.

*Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 280 (3d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992).

The "false representation" alleged by defendants is that the plaintiff "knew or recklessly disregarded that Chariot Group understood the Agreement to include a settlement and extinguishment of plaintiff's § 16(b) claims asserted in the Complaint". D.I. 25 at ¶ 10. The Court finds this argument unpersuasive for two reasons.

First, as discussed above, the facts in the record do not raise an issue of material fact that plaintiff knew the specifics of the February trades, never mind an understanding that any liability for those trades would be released. The record only indicates that plaintiff suspected that some of the shares Goldman Sachs may have been selling might have been defendants'. There is nothing in the record to indicate that plaintiff knew which, if any, of the shares were defendants, nor do any facts in the record indicate that plaintiff knew what prices the defendants were receiving for any shares they may have been selling.

Second, in terms of the plaintiff's representations during the negotiations, the record does not raise an issue of material fact that plaintiff "recklessly disregarded" Chariot Group's understanding that the 16(b) liability would be waived. It is difficult to see how plaintiff could act with reckless disregard for

an understanding which defendant never made clear to plaintiff, despite numerous opportunities to do so. If anything, the record indicates that both in phone calls and in the rejection of the drafted general release, plaintiff made clear to defendants its position that any hidden 16(b) liability would not be waived and defendants proceeded nevertheless, never mentioning to plaintiff the February sales.

In sum, defendants are attempting to argue that the plaintiff not only knew about those trades, which defendants did not disclose until after the Agreement had been executed, but plaintiff also knew, or acted with reckless disregard towards, defendants' understanding that the § 16(b) liability would be released, an understanding which also was not disclosed until after the Agreement had been executed. Under these circumstances, the Court does not find that defendants have adequately supported their claim that a violation of § 10(b) or Rule 10b–5 has occurred. Plaintiff's motion for summary judgment on the counterclaim will be granted.

## IV.

For the forgoing reasons, plaintiff's motion for summary judgment on its complaint will be granted and damages will awarded including prejudgment interest. In addition, plaintiff's motion for summary judgment on defendants' counterclaim will be granted. An appropriate order will issue.